[*48]       *SLEE *v.* THE PRESIDENT AND DIRECTORS OF THE MANHATTAN COMPANY.

S. being indebted to the Manhattan Company, upon a note to the amount of $2,000, and also being in embarrassed circumstances, upon the application of the directors of the company, in order to secure the amount due to the company, he assigned to them a bond and mortgage for $4,000, which he held upon a house and lot in Poughkeepsie, against F. & H. The assignment was made with the express understanding that the surplus, after satisfying the debt of the company, should belong to S. The assignment stated that S., for the sum of $2,000, assigned the bond and mortgage to the Manhattan Company, with power to collect the sum of $2,000 for their own use, and contained a covenant on the part of S., that $2,000 was due on the mortgage, and that the mortgaged premises should sel: for that sum and the interest and costs. In 1817, the Manhattan Company foreclosed the

mortgage, and caused the mortgaged premises to be bid in for $700. Previous to the sale, S. was told by the agent of the company, that if the company purchased in the property, it should remain as it then was as to him, S. merely foreclosing F. & H. S. always insisted upon his right to redeem, and in 1825 made a direct application for that purpose, and offered to pay all that was justly due the company. The company refused to permit him to redeem. It was held that the assignment from S. to the Manhattan Company was a mortgage, and even if it had been in form an absolute assignment of the whole interest of S. in the bond and mortgage against F. & H., that in equity it would have been a mere security for the payment of the debt due the Manhattan Company; that the Manhattan Company had a perfect right to foreclose the mortgage under the statute, for the purpose of barring the equity of redemption which existed in F & H.; that the assignment by S. to the Manhattan Company was a mortgage of the power of sale, as well as a mortgage of the debt; that if a stranger had purchased the mortgaged premises upon the sale thereof, the right of S. to redeem the same would have been gone, but not his right to redeem the second mortgage created by the assignment, which right would then attach itself to the purchase-money instead of the land; that as the Manhattan Company were the purchasers of the mortgaged premises, the right of S. to redeem the said premises remained undisturbed, the legal estate of said premises continuing undivested in the Manhattan Company: that the assignment of the bond and mortgage to the Manhattan Company being itself a subsisting mortgage, and S.'s equity of redemption not being divested by the statute foreclosure, the question of waiver on account of lapse of time did not arise.

Twenty years are required to bar an equity of redemption.

Where a mortgagee obtains a renewal of a lease, or any other advantage in consequence of his situation as such mortgagee, the mortgagor coming to redeem, is entitled to the benefit thereof.

Where, under a statute foreclosure, the holder of the legal estate or mortgagee himself becomes the purchaser of the equity of redemption, no deed is necessary to make his title to the premises perfect.

*Parol evidence is admissible to show that a deed or conveyance, absolute on its face, was intended by the parties only as a mortgage or security for the payment of money.

Where a party files his bill to redeem, the general rule is, that he must pay costs to the mortgagee, although he should be successful.

There are, however, exceptions to this rule; as where the mortgagee sets up an unconscientious defence; in such case the mortgagee is not only refused costs, but must pay costs to the other party.

Margin notes: 1828. Slee v. Manhattan Company.

[*49]

ON the 4th of February, 1814, Slee, the appellant, sold to Frear and Hallowell a house and lot in Poughkeepsie, for $5,000, of which sum they paid down $1,000, and gave

May 26th.

1828.

Slee
v.
Manhattan
Company.

him their bond and mortgage on the premises for $4,000, and interest after the 1st of May, 1814, to be paid in four equal annual payments from the last mentioned day, and the interest on the whole sum to be paid annually. The mortgage contained the usual power of sale, if default should be made in the payments, or any part thereof, at the times agreed upon. Frear and Hallowell paid the interest on the mortgage up to May, 1816. The whole of the principal and interest from that time still remains due. In 1816, and for a long time after, General Tallmadge was a director and president of the branch of the Manhattan Company established at Poughkeepsie. He was also their attorney in relation to all matters and business transacted there. Slee's note had been discounted at that branch, on which there was due to the company $2,000, and interest from the first of May, 1816. In August, 1816, he had stopped payment, a heavy judgment was standing against him, and his indorsees were considered in doubtful circumstances. Tallmadge, knowing of this bond and mortgage, mentioned the circumstance to the board of directors, and told them he would try to get an assignment of it to secure their debt. He applied to Slee for an assignment of the bond and mortgage, and gave him distinctly to understand it was intended only to secure the amount due to the Manhattan Company, and that the surplus, after satisfying their demand, would belong to him.

The appellant finally consented to assign the bond and mortgage, to secure the payment of his own debt to the company, and executed and delivered to Gen. Tallmadge, their attorney, an assignment indorsed on the mortgage as follows:

[*50]

*" For value received, I, Samuel Slee, within named, do assign over the within mortgage, and the bond belonging to the same, to the president and directors of the Manhattan Company, for the sum of two thousand dollars, with interest from the 1st day of May last, with power to

collect for their own use and benefit the sum of two thousand dollars, with interest from the 1st day of May last, in my name or otherwise; and I covenant and bind myself to them, that the sum of two thousand dollars principal is now due and owing on the same, and that that sum, with interest from the 1st day of May last, shall be paid upon the same by the mortgagors within named, on or before the 1st day of May now next, and that the bond and mortgage are valid and effectual, and that the premises within described shall, on foreclosure, sell for the said sum and interest and costs.   Dated August 19th, 1816.

SAMUEL SLEE." [L. S.]

Frear and Hallowell neglected to pay the amount due to the Manhattan Company by the time specified in the assignment, and in May, 1817, General Tallmadge, as their attorney, proceeded to foreclose the original mortgage, by a newspaper notice under the statute, and on the 10th November in the same year, bid in the mortgaged premises for the defendants, for the sum of $700. A few days previous to the sale, Slee applied to him to know what was to be done, if at the sale any other person should bid over the amount due to the defendants, and contended, that by the original agreement, the defendants were bound to bid in the property to prevent its being sacrificed, even if they bid more than the amount of their own debt. Tallmadge told him he did not consider the defendants were to go so far; that he could not think of bidding more than the amount of their debt and the costs of foreclosing, and that if he wanted the property bid over, that he must get some friend to attend and go on with the bidding as far as he thought proper. He also told him that if there were other bidders, he should bid for the property to the amount of the bank debt, and if the defendants purchased in the property, it should remain as it was as to him, Slee, merely foreclosing Frear and Hallowell. Slee has always insisted on his right to redeem on paying

the amount due to the defendants, and Tallmadge always so understood the transaction, and admitted *the justice of his claim. In 1819, a committee of the directors of the company, including Mr. Remsen, the president, came to Poughkeepsie on the affairs of the bank, and were there informed of the claim made by Slee to redeem the property. In April, 1823, in pursuance of a written request from Remsen, General Tallmadge communicated to him by letter a particular statement of all the circumstances relating to this property, and of the agreement which he had made with Slee. In January, 1825, Slee made a direct and formal application to the defendants for the redemption and re-conveyance of the premises to him. He requested an account of the rents and profits received by them, and of the balance due from him, and offered to pay all that was justly due on account thereof. The defendants refused to permit him to redeem, insisting on their absolute title to the premises under the sale of November, 1810. In May, 1825, Slee filed his bill in the equity court for the second circuit, setting forth substantially the facts above stated, except the conversation between himself and General Tallmadge immediately previous to the sale, and praying an account of the rents, issues and profits of the premises, or re-assignment of the bond and mortgage, and a re-conveyance of the mortgaged premises to him, on his paying the balance justly due, and for general relief. The defendants demurred to the bill, except that part thereof which sought an account of the rents and profits of the mortgaged premises previous to the statute foreclosure. The demurrer was argued before Judge Betts, in August, 1825. He decided, that the assignment of the 19th of August, 1816, was a mortgage to the defendants for the security of the debt owing by Slee; that his right of redemption therein had not been legally divested, and the demurrer was overruled. The defendants in their answer subsequently filed, admitted most of the facts stated in the bill, but denied that the pre-

mises were bought in for the benefit of Slee. They ad-mitted they had been in possession of the premises ever since that sale, by themselves or tenants, and had received the rents and profits thereof, and insisted, that by such sale they became the absolute owners of the premises, dis-charged of all legal or equitable claims of Slee thereon. Proofs having been taken in the *cause, it was submitted to Judge Emott, the successor of Judge Betts, on the pleadings and proofs and written arguments of counsel, and he decided that the assignment on its face was a mort-gage or security for the company's debt; that the sale by the defendants under the statute was authorized by the assignment, and was a bar to Slee's equity of redemption in the premises; and the complainant's bill was dismissed. From the decree Slee appealed to this court.

OPINION OF JUDGE BETTS.—The defendants' answer denies all receipt of rents and profits from the mortgaged estate, prior to the purchase by them under the statute fore-closure; and by demurrer they raise the question, whether the plaintiff shows enough upon his bill to entitle him to any relief since that period.

A mortgagee has a power coupled with an interest in respect to the mortgaged estate, (1 Caines' Cases in Error, 1,) and a general assignment divests his interest so effectu-ally that a foreclosure by the assignee is valid as against the mortgagee without using his name, giving him notice, or in any way recognizing his connection with the mortgage. (7 John. Ch. R. 144.) A sale under a power pursuant to the statute, is equivalent between the parties to it, to a sale under a decree of Chancery. (10 John. R. 185.) The de-fendants were entitled to become purchasers at such sale, (1 R. L. 375, s. 10,) and as between them and the mortga-gor, the estate would pass upon such purchase without the execution of any deed of conveyance. (4 Cowen, 266.)

This assignment, construed by itself, is clearly absolute, and vests the defendants with the whole estate and interest

1828.

Slee
v.
Manhattan
Company.

[*52]

of the plaintiff in the subject. No relationship was created by it between the parties, other than to constitute the defendants trustees to pay over to the plaintiff any surplus beyond their debt and costs which might be raised upon the sale of the mortgaged premises; and the situation of the parties resulting from the assignment, and the consideration for it, does not necessarily imply that the defendants received it in any other capacity than that of purchasers. The foreclosure, therefore, vested the absolute estate in them also as against the mortgagee, unless the plaintiff has shown [*53] something more to *support his claim against the defendants than the mere instrument of assignment. The bill sets up an express contract of the defendants, to become trustees to the plaintiff in respect to the bond and mortgage and the mortgaged premises assigned them. It avers that the defendants, by their attorney and agent, applied to the plaintiff for the assignment, and proposed to receive it in trust to pay his note to them, and to pay back all moneys received by them above that, and on payment of the note by the plaintiff, to re-assign to him the mortgage, with the premises therein described; that he acceded to the proposal, and thereupon the defendants agreed to hold the bond and mortgage and mortgaged premises as security for the pay ment of the note, and in trust to pay back to him the surplus collected therefrom above his note, and to re-assign and re-convey to him the bond and mortgage, together with such right and interest as they might have in the mortgaged premises. And the bill further avers that the defendants took the conveyance of the premises on the sale, with intent to vest the title in them, to hold as security for the debt due them and in trust for the plaintiff, &c., &c.

These allegations are sufficiently comprehensive and distinct to denote a trust, and if it is of a character to be enforced in this court, the demurrer being both to the discovery and relief sought, is clearly bad. (3 Bro. Ch. Cas. 646, Eng. ed. note.) Equity considers collateral securities to creditors, as trusts for the better protection of their debts,

and will compel the fulfilment of their intentions. (1 John. Ch. R. 119.) This would, therefore, be a trust which this court must protect. The truth of these averments in the bill is to be taken as admitted by the demurrer, not a resulting trust, which can only be raised by the actual payment of money, the consideration upon which the estate vests, (2 John. Ch. R. 405; 5. id. 1,) but a trust connected with and part and parcel of the assignment, being the condition upon which the defendants took and executed the power, and demonstrating their capacity in relation to the plaintiff. The answer not alleging the trusts to have been in writing, it will probably be presumed in this court that they are to be proved by *parol. (2 Br. Ch. Cas. 568; 2 Dickens, 664; 5 Ves. jun. 554; 3 Br. Ch. Cas. 400.) But that mode of proof is admissible and competent, and has been received even to establish trusts in and concerning lands, *Harvey* v. *Harvey*, 2 Cas. in Chan. 180,) and is always received without question where the statute of frauds does not intervene. (1 Dall. 193; id. 424.) The general assignment becomes therefore qualified and special, and will be permitted to operate only as limited by the terms of the trust. (1 John. Ch. R. 119; 6 id. 417; 2 Cowen, 246.)

The bill seeking relief not upon the foundation of the written assignment only, but upon the trusts accompanying it, it presents a proper case for the interference of this court, unless the plaintiff's remedy is lost by lapse of time. It becomes, therefore, important to inquire in what character this assignment was made to the defendants, whether as mortgagees or trustees for the plaintiff, in relation to the mortgaged fund.

If no other interest was conferred upon the defendants by the assignment, than to dispose of the estate and pay over the money, most clearly they would be merely trustees to sell. This would not impeach their competency to purchase. The rule laid down by Lord Thurlow, *Crow* v. *Ballard*, (3 Bro. Ch. Cas. 119,) that it is impossible at any rate that the person employed to sell can be permitted to

[*54]

buy, has been explicitly denied in the English courts and ours, and is now no longer followed. The principle now recognized is, that he is entitled to no advantages from his purchase; but it is at the option of the *cestui que* trust to consider him a trustee and as holding the estate in his behalf. (*Whichcote* v. *Lawrence,* 3 Ves. jun. 740; *Campbell* v. *Walker,* 5 id. 678; 1 Caines' Cas. in Error, 20; *Munroe* v. *Allaire,* 2 id. 182.) The doctrine of these cases is repeated and sanctioned in *Provost* v. *Grants,* (1 Peter's Rep. 364,) and *Davoe* v. *Fanning,* (2 John. Ch. R. 252.)

The South Carolina Court of Chancery have had the doctrine in two cases under consideration, but divided without settling the law. They would seem inclined to hold the purchase *absolutely void. (4 Dess. 486, 504, note; and again, id. 702.)

[*55]

But though the *cestui que* trust has an election in this matter, it is not *ad libitum* as to time. It must be exercised within a reasonable period after he is apprized of the purchase. No general rule can be laid down with exactness, defining what shall be, in all cases, reasonable time. The numerous cases which have occurred and turned upon this point, have been decided on their own peculiar circumstances. Various periods have accordingly been adopted, at which the courts say the *cestui que* trust shall be presumed to have acquiesced in the purchase, and he is held absolutely concluded from disturbing it. *Bergen* v. *Bennet,* (1 Caines' Cas. in Error, 1,) was a foreclosure of a mortgage under the power, and the mortgagor was under sixteen years' acquiescence, knowing the sale, denied the right of redeeming. Judge Washington, (1 Peters' R. 368,) would seem only to require the fact of notice to the *cestui que* trust that the trustee had purchased, to raise a presumption of his acquiescence, and without notice, he denies a lapse of time to be a bar. Chancellor Dessaussure refers to numerous English cases in which relief was granted after a lapse of 6, 7, 12, 14 and 20 years, to which may be added 2 Bro. P. C. 111; s. b., 15 Vin. 468, in which relief was denied after six years.

The result of the cases shows manifestly that courts do not consider it a matter of course to divest the purchase of a trustee, where he has acquired the formal legal title. A proper diligence must have been indicated on the part of the *cestui que trust.* In the present case, I should deny the plaintiff relief upon this ground. He was present at the sale and intimated no dissatisfaction with the defendant's purchase. He considered the sale absolute and not for his benefit, because he declined bidding, as he states, on account of his embarrassed circumstances. He allows the defendants to take the estate as owners, and never intimates a claim upon them until 1825. If they were only trustees to sell, equity, under all these circumstances, would presume the trust discharged to his approbation, and hold him now concluded from disturbing the sale. The defendants are permitted to avail themselves of *this objection by demurrer. (19 Ves. 180; 2 Sch. & Lef. 63; 1 Bro. P. C. 95.)

The transfer of the security by the plaintiff to the defendants, is, in legal contemplation, a mortgage. The transaction throughout, as set up in the bill, was for the sole purpose of securing the plaintiff's debt to the defendants. An absolute sale of the mortgagee's interest cannot be implied by construction of the instrument against the direct averment of the plaintiff to the contrary, and the admission of that allegation by the defendants.

It is unquestionably the rule of this court and at law, that a deed, however absolute the terms may be upon its face, if really only intended to secure a debt, will be deemed a mortgage, though the defeasance is by parol. (1 John. Ch. R. 594; 4 id. 167; 6 id. 417; 7 id. 40.) It never loses the character and quality of a mortgage, and the right of redemption, as an inseparable incident, cannot be restrained or clogged even by the stipulation of the parties. (*Clark* v. *Henry,* 2 Cowen, 324, in error.) Lapse of time in this case cannot affect the remedy; for as against the mortgagor, possession by the mortgagee for any period short of 20

1828.

Slee
v.
Manhattan
Company.

[*56]

years, will not bar the equity of redemption. (*Anon.*, 3 Atk. 213 ; *Moore* v. *Cable*, 1 John. Ch. R. 385.)

There is here no foreclosure of the plaintiff's interest. He not having been made a party to the proceedings against the original mortgagor, and none having been instituted for the purpose of divesting his right, his interest accordingly remains unaffected, and the mortgage created between him and the defendants yet alive and subject to redemption. (*Hobart* v. *Abbot*, 2 P. Wms. 642 ; *Johnson* v. *Hart*, 3 John. Cas. 322.)

The demurrer is overruled. The defendants are allowed 30 days to answer, on paying costs of the demurrer.

Costs would not have been allowed, had the demurrer been taken to the right of the party under the assignment alone ; but an express agreement of the defendants being alleged, qualifying the character of that assignment, and showing it, instead of being an absolute transfer of his interest, only a pledge to secure his debt to them, the defendants ought to have answered that averment.

[*57]

*OPINION OF JUDGE EMOTT.—The bill in this cause states that George Hallowell and John B. Frear, on the 14th day of February, 1814, gave to the complainant a bond for the purchase-money of a lot in the village of Poughkeepsie, conditioned for the payment of four thousand dollars, and that on the same day they gave a mortgage on the premises, with a power to sell to secure the bond ; that previous to the year 1816, the defendants established a branch bank at Poughkeepsie, making James Tallmadge a director and president of such bank, and that he was also the attorney and counsel of the defendants, "in relation to all business done and transacted at said branch," and that he continued to be such director, attorney and counsel during the whole time the branch remained at Poughkeepsie, and until long after the 19th day of August, 1816 ; that previous to the last mentioned day, the plaintiff had discounted at the branch bank a note drawn by him and indorsed by Joseph

H. Cunningham and Albert Cocks, on which there was due on the 1st of May $2,000; that the plaintiff became embarrassed and unable to pay his debts, and had little or no property with which he could secure any of his debts, except the said bond and mortgage; and both of his indorsers, prior to the 19th of August, had become so insolvent that their names were not considered as adding much if anything to the security of the note; that Tallmadge, acting for the defendants, on the 19th of August, 1816, applied to the plaintiff to assign the bond and mortgage to be held as security for the note, and in trust to pay to the plaintiff all moneys collected thereon above the amount due on the note, and on payment of the note by the plaintiff, to re-assign the bond and mortgage to him; that the plaintiff assenting to such proposition, he, on the 19th of August, made an assignment on the back of the mortgage, by which, for value received, he assigned over the mortgage and the bond belonging to the same to the defendants for $2,000, with the interest from the 1st of May, with power to collect for their own benefit such sum and interest, and covenanted that such sum was due and would be paid by the mortgagors, and that the securities were valid, and the premise should on foreclosure sell for such sum; *which assignment was so made, with an agreement and understanding between the plaintiff and Tallmadge, acting as the agent and attorney of the defendants, that the defendants should hold the said bond and mortgage as security for their debt and interest, to pay the plaintiff such sum as might be collected thereon over the sum due to them, and on payment of their debt by the plaintiff, they were to re-assign to him the bond and mortgage: that immediately after the assignment, the defendants took possession of the premises, and have ever since held such possession, receiving the rents and profits, and that the rents which they have, or, but for their neglect, they might have received, amount to much more than the interest accruing on the said note; that in May, 1817, the defendants commenced proceedings to fore-

[*58]

1828.

Slee
v.
Manhattan
Company.

[*59]

close the equity of redemption of Hallowell and Frear, by "duly" advertising under the mortgage for the 10th of November, and that on such day the mortgaged premises were duly sold at auction according to the requirements of the act; and that the complainant, "from his pecuniary embarrassments, being unable to purchase the premises or to bid upon the same," they were struck off to Tallmadge as the agent and for the benefit of the defendants, for the nominal sum of $700. On the 11th of November, the defendants conveyed under the sale of Tallmadge, and Tallmadge, on the same day, quit-claimed to the defendants. The plaintiff alleges "that the said conveyances were made with the intention of vesting the title to said premises in the defendants, that they might hold the same as security for the sum due to them, and interest from the plaintiffs as already mentioned, and not to vest any title or interest in the premises in Tallmadge;" that the mortgaged premises now are, and ever since such foreclosure have been worth the sum for which they were mortgaged by Hallowell and Frear; that the plaintiff is, and for a long time past has been ready to pay such sum as may be due to the defendants for their demand, after deducting the rents which they have or might have received, and he has frequently offered them to pay such balance as soon as they furnish him with a full and accurate account of the same. In particular, he says he applied for such purpose to the *defendants on the 18th of January, 1825, and again on the 7th of May, 1825; but they have hitherto refused.

The defendants, in their answer, admit that James Tallmadge was a director and president of their branch bank at Poughkeepsie, and was also their attorney and counsel in his professional capacity; but not otherwise in relation to business done and transacted at the branch generally. The defendants, in answer to the inquiry about the assignment, say that the plaintiff, on the 19th of August, 1816, being indebted to them on his note in $2,000, as a security for the payment of such debt, agreed to assign to them the

bond and mortgage, and thereupon did make the assign-
ment which they set forth. They admit that the assign-
ment was made to be held as a security for their debt as
expressed in the assignment, but they deny that the assign-
ment was made with any agreement or understanding
between the plaintiff and Tallmadge, acting as their agent
or otherwise, or between the plaintiff and themselves, " that
they should hold the bond and mortgage with the mort-
gaged premises in trust for the plaintiff, to pay him the
overplus money or to re-assign to him," or upon any terms,
trust or condition, other than what is expressed in the
assignment, or that there was any agreement or under-
standing in relation thereto, other than what is contained
in the assignment. As to the sale, they say " that it was
on their own account, and not as assignees having a trust
for the plaintiff other than such trust as is contained in the
assignment; and that it was made with a view to sell the
property for such sum as could be obtained for the same,
and to have their debt paid, and not for the purpose merely
of foreclosing the equity of redemption of Hallowell and
Frear." The defendants allege that Slee resided at Pough-
keepsie, and was acquainted with the sale; and they charge
that the plaintiff knew of their purchase, and never set up
or pretended any interest in the premises, or that the de-
fendants were at all accountable for, or held the same in
trust for him, or gave them any notice or intimation that
he should consider them as trustees for his accounts, or
pretended any right or intention to redeem until January,
1825, more than seven years after the sale; and on the
contrary, he, during *all that time, suffered the defendants      [*60]
to treat the property as their own.

The only witness examined on the part of the plaintiff,
who testified relative to the assignment and sale, was Gen.
Tallmadge. He testified that the plaintiff and his indorsers
being in doubtful circumstances, he applied to the plaintiff
to make an assignment of the bond and mortgage of Frear
and Hallowell, and held out by way of inducement certain

benefits to the plaintiff, which related to certain bonds and mortgages given by him to the Van Benschotens, and which benefits the plaintiff afterwards realized through the agency of the defendants. He says he pressed the plaintiff to make the assignment, and always spoke to him that all over the $2,000 would remain to him: the proposition always was, that the plaintiff should have the surplus. He also says, there was no express agreement that the plaintiff should have the surplus, but all the propositions and conversations of himself with the plaintiff were based upon the supposition that the plaintiff was to have the surplus. He testified further, that in the spring of 1817, he commenced proceedings to foreclose the mortgage by advertising for the bank, and sold the premises in the fall. A few days before the sale, the plaintiff called on him and wanted to know what was to be done in case there was a bid over the $2,000; he wished the bank to bid at least $3,500. To this he replied, that he had fulfilled his agreement in removing the Van Benschoten mortgage, and that he did not think the bank was bound to bid more than the amount of their debt; that if the plaintiff wanted the property bid over, that he must get some friend to attend and go on with the bidding as far as he thought proper. The plaintiff then said he had no funds to go on with the bidding; to which the witness replied, that he needed no funds, as his receipt would answer for all over the bank debt. The plaintiff said he had no friend to come forward except the witness; to which he replied, that he could not consent. Witness then told the plaintiff that he should bid for the property the amount for the debt, and if the purchase was made under that sum, the property should remain as it was as to the plaintiff, only foreclosing Frear and Hallowell. The *understanding of the witness was, and ever since has been, that the plaintiff would be entitled to the overplus money, only foreclosing Frear and Hallowell. At the sale, some one bid $500; witness bid $700, and the property was struck off to him. The property was then worth

[*61]

$3,500, and is now worth $3,000. He does not know that the plaintiff had any one to bid at the sale. The plaintiff has at all times, and in all conversations with the witness, claimed a right to redeem ; and he has always admitted it. In the summer of 1819, a committee of the bank came to Poughkeepsie on the affairs of the bank, and witness understood from them that the plaintiff had claimed the property ; but witness thought they did not understand it. He had stated the claim of the plaintiff to Mr. Remsen, the president of the company, many times, and in particular by letters of the 2d of March and 20th of April, 1823. On his cross-examination, the witness said that there was no specific agreement at the time of the assignment, nor was there any specific agreement ; but it was well understood that the plaintiff was to have the surplus. The plaintiff did not require the property to be sold. The sale was fair, public and open.

There is much repetition in the testimony of Mr. Tallmadge, owing to the mode of the examination, and the natural desire on the part of the plaintiff to have his understanding and views placed in full relief. What has been mentioned gives in sufficient detail what was testified to by him for all the purposes of this opinion.

The assignment has been introduced. It is on the back of the mortgage, is dated the 19th of August, 1816, and is under the hand and seal of the plaintiff. It, for value received, assigns over the bond and mortgage to the defendants for the sum of $2,000, with interest from the 1st of May, with power to collect for their own use and benefit such sum in his name or otherwise. The plaintiff covenants that such sum is due, and will be paid by the mortgagors by the first day of May then next ; that the bond and mortgage are valid ; and that the premises on foreclosure, will sell for such sum.

*On this state of facts, the plaintiff claims a right to re- [*62] deem on three grounds : 1. Because the foreclosure itself was informal and imperfect, the assignment being but for

part, leaving an interest in him which made him a necessary party, (plaintiff, if we may so term it,) to the advertisement; 2. Because the plaintiff is not bound by the foreclosure, and that he could alone be barred by a foreclosure in Chancery to which he was a party; 3. Because the defendants were trustees for the plaintiff, and they cannot therefore avail themselves, as against him, of their purchase.

Let it here be remembered that the plaintiff's claim, made by his bill, is not founded, and was probably not intended to be founded on fraud. If he had set up a distinct and available fraud, either in the assignment or sale; if he had, by his great confidence in the defendants or their agents, been induced to give an absolute instead of a defeasable assignment, or a pledge of his security for an amount not due; if he had been lulled into a false security at the sale by the fraudulent representations, or what would have amounted to the same thing, the unperformed promises of the defendants or their agents, so that he had not taken the measures which he intended and which he had in his power, the fraud would have created a trust which might have been enforced here without any writing. But no such fraud was presented by the plaintiff in his bill, and it could not therefore be made by the court a ground for relief, even if it appeared in the testimony. When speaking of a fraud which might have been made a ground of claim, I have termed it an available fraud, to distinguish it from frauds which are not so. Such frauds are now a distinct head in equity, and there is almost as much certainty about them as about any other part of Chancery jurisdiction. But there are frauds which Chancery cannot and dare not face and relieve against; frauds which are protected by statute, or covered up by the general rules and maxims of the court. Able counsel and grave judges frequently say that the statute of frauds shall not be made an instrument of fraud; and yet it is not difficult to show, and most professional men have seen, that this statute, with its high

title, may be made and has been made an instrument of *fraud. It is merely necessary to advert to the rule which makes age a test for capacity, and therefore invalidates the contracts of minors, as one which has covered many and great frauds by persons of mature mind, and to the law of this court, that parol evidence shall not be permitted to contradict or substantially vary the legal import of a written agreement, as frequently and necessarily making a new contract for the parties, by which fraud receives a premium.

General laws and general rules are necessary for the purposes of society; and they are emphatically necessary to save parties against the passions, the mistakes and the false views of judges. When the judge applies the laws to the case, there is safety. When he passes on each case individually, with no rule but that of his feelings and discretion, there is great danger to the parties. The injuries inflicted by general rules are casual, but those which would spring from an unqualified discretion in the judge, would be continual and most mischievous.

It must not be inferred from these remarks, that I have discovered anything like a technical fraud in the testimony in this cause with respect to the assignment. If it is in its terms, as I think it is, a mortgage to secure the smaller demands of the defendants, it is, of a necessary consequence, to give to the plaintiff a right to the surplus, and a right to redeem if he came in time. This is all that was or could be intended, and all that Gen. Tallmadge can testify to. In the assignment, then, there is no shadow of fraud. In the sale, if there was an understanding or a wish that the purchase might, as between these parties, leave the property as it found it, and it turns out otherwise, still there is no technical fraud, as the plaintiff had avowedly neither money or friends to aid him; and so far from being persuaded not to bid, he was advised to the contrary. The case, therefore, as far as it shows a loss to the plaintiff, is a case of hardship, not perhaps to the extent pressed in the court, inasmuch as

no attempts have been made to collect anything on the note, and so much time has elapsed that the remedy must now be gone, if the wish remained to get the residue, or if the plaintiff could respond to it. As a case of hardship, however *much my feelings may be awakened or enlisted, I am bound to take care that my judgment should remain free to decide as the law directs. It will be seen that I do not look at the testimony of Gen. Tallmadge as very essential. The cause, were it otherwise, standing as it does in opposition to the direct and positive answers made by the defendants to questions put to them by the bill, no decree could probably be founded on it. As far back as 1683, we find it established, that there being but one witness against the defendant's answer, the plaintiff could have no decree; (1 Vern. 160;) and the rule remains to the present day, though the reason of it is not very apparent, or at least usually given for it. That it is oath against oath, is not altogether conclusive. (1 Br. Ch. Cas. 52.)

The first question to be considered is, whether the statute foreclosure was formal, the plaintiff not having joined in the advertisement. The objection is, that inasmuch as the plaintiff had an interest in the mortgage, he was a necessary party; and to support this objection, I am referred to the opinion of Mr. Justice Woodworth, in *Wilson* v. *Throup*, (2 Cowen, 231,) in which he says, speaking of these foreclosures, "The act contemplates that the notice be given, and the sale made by the mortgagee or others thereunto authorized. If the mortgagee has assigned all his interest, notice must be given by the assignee. If a part of the bond and mortgage is assigned, the mortgagee and such assignees are the proper parties." This objection necessarily leads to a consideration of the nature of the instrument; and when that is ascertained, we shall be able to see how the reasoning of the judge operates on the foreclosure. In a former stage of the cause, this paper appears to have been the source of considerable perplexity. Sometimes it was viewed as an absolute assignment of all interest in the bond and mort-

gage; and this probably caused Gen. Tallmadge to say, when he testified, that "he never would have acted as agent in the transaction of Slee, was he to have lost all benefit in the surplus, and that all the conversations were based on the supposition that he was to have the surplus." At other times it was spoken of as a declaration of trust, and then it was treated as a *mortgage; and yet it appears to me that the paper is so marked as to leave no reasonable doubt of its kind and character. There is nothing technical in it to bind, nothing obscure to embarrass. The intent is palpable, and everything is left clear to have the intent carried into effect.

The instrument commences, " For value received, I assign over the within mortgage and bond belonging to the same." Here is the act done, a transfer of the entire security. It proceeds, " for the sum of $2,000, with interest from the first day of May, to collect for their own use and benefit the sum of $2,000 and interest," with covenants that so much is due and will be paid by the mortgagors by the first day of May then next, and that the premises will bring. such sum on foreclosure. Here is the object: a security for an existing debt, and it gives power to collect in the name of Slee or otherwise. Here is the express authority given to enforce the security assigned. It is nothing more or less, from its very form, than a pledge for a debt of $4,000 for securing a demand of $2,000 ; and then follows the law of this court, that every contract for the securing of money by a conveyance of property, either personal or real, is in equity deemed a mortgage. This established, then follows, as a necessary consequence, and without any express stipulation, the right to redeem, (2 Atk. 490,) and the right to the surplus.

The assignment is of the whole interest. Although being for a particular purpose, it may be satisfied with a part. Indeed, in all cases of mortgages, the transfer, as far as re‧ lates to the remedy, will be taken to be entire and exclusive, unless made otherwise by express stipulation, as being

1828.

Slee
v.
Manhattan
Company.

[*65]

necessary to enforce the right. The remedy by suit on the on bond, and of foreclosure on the mortgage, if a divided one between the mortgagor and mortgagee, would produce delay and vexation, and would make an appeal to the Court of Chancery necessary in almost every case. In the common case of a mortgage with power to sell, it would be strange to ask the mortgagor to join with the mortgagee in the advertisement; and yet the mortgagor has an interest in the property, and in many cases far beyond that of the mortgagee. Nor is there any more reason in this case that the plaintiff should have *joined in the notice of sale. It was in truth adverse to him. The reasoning of Judge Woodworth is not, therefore, applicable, and is based on a different state of facts; and I think we may safely conclude, that the advertisement, as far as it will serve any purpose, was rightly made in the name of the defendants.

[*66]

The next question is, whether the plaintiff is bound by the statute of foreclosure, the proceedings being regular and not tainted by fraud. The mortgage, at its introduction, created an estate upon condition, and the estate became absolute when the condition was not performed. (Litt. sec. 332.) There was no such thing known as an equity of redemption, and Lord Hale observes, that in 14 Rich. 2, the parliament would not admit of redemption. (1 Ch. Cas. 219.) Mr. Butler remarks that it was admitted soon after, (Co. Litt. 203 b. note 96,) but Mr. Fonblanque says, that although the right is now incontrovertibly established, he has not been able to trace the period when such right was first established. (2 Fonbl. 260, note c.) This right being an equitably one merely, could only be enforced in Chancery by a bill to redeem, and this bill was entertained until the right was extinguished by a bill to foreclose the equity of redemption. Early in the last century, an attempt was made, by inserting in the mortgage a power to sell free from redemption, to create a trust in the mortgagee for such purpose, so that the right to redeem might be extinguished without having recourse to a court of equity; but it did not

succeed, the Court of Exchequer ruling against the power and the sale under it. (*Craft* v. *Powell*, Com. R. 603.) From the inconvenience resulting from the difficulty of the delay and expense attending a bill to foreclose, a new attempt has been made in England to get rid of them, by taking the conveyance of the fee to trustees in trust for the mortgagee for a term of years, subject to redemption, with remainder to the trustees in trust, in default of payment to sell the estate, and to apply the purchase-money, after defraying the expenses of the trust, in payment of the mortgage-money and interest, and then to pay over the residue to the mortgagors. (1 Pow. on Mort. 13.) Mr. Powell doubts the success of this experiment, but I am not aware that it has been put down by the decision of any court.

*About the period of the case of Craft and Powell, a question arose, whether exchequer annuities could be sold without a foreclosure in equity, when Lord Harcourt ruled against the sale; but on appeal, this decision was unanimously reversed by the lords, one of the grounds taken for the reversal being the known and constant practice, in the case of a mortgage of such securities, to proceed to a sale on an eight or ten days' notice. (*Tucker* v. *Wilson*, 1 P. Wms. 261; 5 Br. Parl. Cas. 193.) This reversal took place in 1714, and since that time it has been uniformly held in the English equity courts that a bill of foreclosure is not necessary in a mortgage of stock, while it must be brought on a mortgage of land. (*Lockwood* v. *Ewer*, 2 Atk. 303; *Kemp* v. *Westbrook*, 1 Ves. 278.) The reason for this difference is not very obvious; and we may be allowed to consider the system of Chancery foreclosures as originating in a desire to protect and continue a landed aristocracy, rather than as proceeding from any fixed principle of equity; otherwise it is difficult to conjecture why a bill to foreclose should be required in the case of a mortgage of a small real estate, while a much greater interest in the funds, according to its money value, may be disposed of by the mere act of the party holding the security.

1828.

Slee
v.
Manhattan
Company.

[*67]

1828.

Slee
v.
Manhattan
Company.

The care to preserve property in families must be excessive in England, not to permit a foreclosure by the creation of a trust and sale by trustees, as such foreclosure would save a great and unnecessary expense, and would be as safe to the party, as he would have the selecting of his agent.

There is no point of policy which ever called upon us in this country to adopt, to its full extent, the English practice; and, in truth, our doctrine of mortgages and foreclosures seems, at an early day, to have varied materially from that of the mother country. In England there was no desire to raise up a large and permanent landed interest in the colonies; and hence, so far from fencing round real estates, by regulations or instructions, they at an early day authorized the sale of lands on an execution in the colonies, and we were left to fashion our laws and customs on this subject according to our own views and caprices.

[*68]

*The first of our statutes on the subject of mortgages, is that of the 12th December, 1753, for preventing frauds by mortgages to be made after the first day of June, and which provides for their registry. On the 19th of March, 1774, more than twenty years afterwards, another law was passed, reciting that the former statute had been eluded by the making of absolute conveyances of real estate, and the giving of conditional defeasances instead of mortgages in common form; and it is enacted, that every deed conveying a real estate, made after the 1st of June, which shall appear by any other instrument to have been intended only as a security in the nature of a mortgage, though it be an absolute conveyance in terms, shall be considered as a mortgage, and be adjudged as coming within the registry act. I refer to these as showing that we had a system of our own. In England, the Chancery decisions for centuries had made such conveyances mortgages, and yet at this late period, when the English laws were perfectly understood here, and when we had a most able and learned bar, this statute was deemed necessary,

and so far from being declarative, its enactment is pros-
pective.

· With us, in the first stages of our colonial government,
lands were easily procured, and were not valued more than
personal property.   The party holding a mortgage on real
estate was accordingly permitted, under a power for such
purpose, to sell without a bill of foreclosure, as he might on
a mortgage of personal property.   The state of the courts,
too, made this necessary, as it will be recollected that the
Court of Chancery, as held by the governor, was deemed
an usurpation.   In 1735, we have a resolution of the
assembly, that a court of chancery within this colony, in
the hands or under the exercise of a governor, without
consent in general assembly, is contrary to law, unwarrant-
able, and of dangerous consequence to the liberties and prop-
erty of the people.   In 1737, we have the address of the
assembly to Lt. Governor Clarke, in which the court is again
treated as illegal, and it is added, that the court, as man-
aged, proved of no use to the public or benefit to the gov-
ernor ; for as few of them had talents equal to the task of
a chancellor, which they had *undertaken to perform, so it
was executed.   Accordingly, some of them being willing
to hold such a court, others not, according as they hap-
pened to be influenced by those about them, so that, were
it established in the most legal manner, yet being in the
hands of a person not compellable to do his duty, it was
so managed that the extraordinary delays and fruitless ex-
pense attending it, rendered it not only useless, but a griev-
ance to the inhabitants, especially those who were so un-
fortunate as to be concerned in it.

[*69]

Mr. Smith, the historian, himself an able lawyer, writing
in 1756, says of the Court of Chancery, " Of all our courts,
none has been more obnoxious to the people than this."
He remarks, that from the time of the memorable address
of 1737, the Court of Chancery has been unattacked by
the assembly, but that the business transacted in it was
very inconsiderable.   We can now be at no loss to deter-

mine why these powers were resorted to. A court so constituted and questioned, and exercised, could hardly be considered as existing for any beneficial purpose, and hence the necessity of some mode of foreclosure other than by bill.

These powers accordingly took deep root, and to prevent any questions as to sales under them, the act of the 19th of March, 1774, was passed; the second section whereof reciting that many real estates were held under sales made by mortgagees, who were authorized by the mortgagor to make a conveyance of the same for the payment of the debt, and to return the overplus, and thus many inconveniences might arise if such estate should be redeemable in equity, vexatious suits promoted, and *bona fide* purchasers ruined. And it is enacted, that no good and *bona fide* sale of lands made or to be made by mortgagees or others, authorized by a special power, shall be defeated to the prejudice of the *bona fide* purchaser, in favor or for the advantage of any person claiming a right of redemption in equity, with a saving to other mortgagees and to judgment creditors. With respect to sales after the passing of the act, it is provided that they shall be at public auction, and on a six months' notice. In our first revision after the revolution, these provisions, with the recital, are by the statute of the 21st of February, 1788, adopted in *terms. In the revision of 1801, the same provisions are substantially adopted in the act of the 6th April, 1801; and in the revision of 1813, the clause in the last act is inserted in the very words in that of the 19th of March, 1813. It is now established by statute, that no sale of any lands made or to be made in due form of law, by any mortgagee or others thereunto authorized by special power for that purpose, from any person entitled to the equity therein, shall be defeated to the prejudice of any *bona fide* purchaser in favor or for the advantage of any person claiming such redemption in equity, saving, however, the rights of subsequent mortgagees and judgment creditors.

[*70]

I have gone into this detail to show that these powers, and the sales under them, are as ancient as the formatio:. of the English government in this state; that they were adopted from necessity, and have always been deemed a safe and cheap mode of foreclosure, and that they have received the deliberate and repeated sanction of the legislature. Were we now passing on them for the first time, we might ask, why the mortgagee should be turned over to the Court of Chancery, when he gives the parties interested ample time and notice to redeem, and when the sale is made openly and subject to all the bidding and competition which could take place at a master's sale? The foreclosure is simple, cheap, and apparently as little liable to abuse as a judicial foreclosure; and the proceedings have accordingly been received favorably by our courts. In *Jackson* v. *Henry*, (10 John. R. 193,) Chief Justice Kent, in delivering the opinion of the court, says, that the statute renders such sale equivalent to a foreclosure and sale under a decree in Chancery. In *Doolittle* v. *Lewis*, (7 John. Ch. Cas. 45,) Chancellor Kent says: It is the policy as well as the language of the statute, that these foreclosures and sales under a power, should, in cases free from fraud and gross irregularity, be held final and conclusive. And in *Wilson* v. *Throup*, (2 Cowen, 202,) Chancellor Kent says: The statute foreclosure is cheaper and more simple, and generally more expeditious than a foreclosure by bill in Chancery. And in each of these cases, the sales, although sought to be impeached and set aside, were affirmed. As to the person bound by the foreclosure, the statute *makes it binding on all persons claiming the redemption in equity, with the exception of any other mortgagee of the same premises, or any part thereof, whose title accrues prior to such sale. The statute foreclosure has technically, as well as in truth, no parties; the advertisement being a simple notice that a mortgage has been given, and that the property is to be sold under the power. It names none but the person who gave the mortgage, and him only as descriptive of the

1828.

Slee
v.
Manhattan
Company.

[*71]

mortgage, and yet binds heirs, devisees and subsequent purchasers, whether immediate or derivative, or in the words of the statute, all persons claiming the redemption in equity. If the plaintiff, therefore, here is not bound by the sale, it must be because he comes within the words of the proviso or exceptions. In *Demarest* v. *Wynkoop*, (3 John. Ch. Cas. 144,) Chancellor Kent, speaking of the infancy of some of the persons' interested in the mortgaged property sold under a power, says: The statute has no saving clause for persons laboring under disability, but is peremptory that no sale under such power shall be defeated, to the prejudice of any *bona fide* purchaser, in favor of any person claiming the equity of redemption; and when the statute makes no exception, the court can make none. To such claim by him, it seems to be a sufficient answer, that he is not a mortgagee of the same, or any part thereof, with a title accruing prior to the sale. In truth, if his assignment constitutes him a mórtgagor or mortgagee of the lands, he is the former and nòt the latter, and therefore not within the saving of the statute. But it is doubtful whether he is to be considered as one or the other, and whether he is not merely the pawner of a debt to secure a demand against himself.

In *Brewer* v. *Gibbs*, (Prec. in Chan. 99,) the Chancellor declared that a mortgage is looked upon as a personal contract, and that the mortgagee has no interest beyond his money. In *Jackson* v. *Blodget*, (5 Cowen, 202,) it was held that the assignment of a bond or debt secured by mortgage, passed the interest in the mortgage, the debt being the principal, the mortgage the accessary. In *Johnson* v. *Hart*, (3 John. Cas. 322,) in error, it is held that the debt secured by mortgage is considered as personal estate, and may be disposed of as such. In *Green* v. *Hart*, (1 John. Rep. 541,) it *is said that mortgages are not now considered as conveyances of lands within the statute of frauds; and that the forgiving of the debt with the delivery of the security is an extinguishment of the mortgage. And in the spirit

*72]

of these cases, it is said in *Jackson* v. *Craft*, (18 John. 110,) that if a legal tender is made of the money due on a bond and mortgage to the mortgagee or his attorney, which he refused, the land is discharged from the mortgage, though the debt remains. And in *Jackson* v. *Stackhouse*, (1 Cowen, 122,) the court held that a release of the debt discharges the mortgage ; and that in an ejectment by the mortgagee, the defendant may defeat the action, by proving by parol that the mortgage debt was paid. The assignment of the mortgage, therefore, in this case, without the bond, would have been a mere nullity ; and whatever may be the form, the substance of the transaction was a pledging of the debt by way of security, such pledge carrying with it as an incident, the mortgage. There was, then, no mortgage of the same premises, or any part thereof, made by this assignment, nor was there any necessity or use in a bill of foreclosure against the plaintiff, as his interest which was in the debt was not to be sold, but the interest of the mortgagor which was in the land, in order to raise the debt. If a bill had been filed, the plaintiff would not have been a necessary, if a proper party. He had withal, by the terms of the assignment, authorized the collection of the moneys in his name or otherwise, and the advertisement and sale under the mortgage were nothing more than a means of enforcing and collecting the debt. I am, upon the whole, after great consideration, of opinion that the plaintiff is bound by the statute foreclosure.

The third question is, whether the defendants were not trustees for the plaintiff, and therefore as against him cannot avail themselves of their purchase. It cannot be necessary to examine the general doctrine of sales and purchases by trustees to decide this point. The courts certainly have gone very far towards establishing, that if a trustee under a sale not judicial becomes the purchaser, the *cestui que trust* may regard the trust as still continuing. I am not now allowed to say whether the doctrine has not been carried too *far, but I am certainly not disposed to extend it to a

1828.

Slee
v.
Manhattan
Company.

[*73]

1828.

Slee
v.
Manhattan
Company.

new class of cases. That in mortgages and in the assignment of securities where the assignor retains or may have an interest, there is, in the language of the Court of Chancery, a trust, there is no doubt. But it has never been held that such trust created an incapacity in the mortgagee or his assignee to become a purchaser; and where the sale was fair and in good faith, the case has not occurred wherein the mortgagor or assignor has succeeded in setting aside the sale. It is true that in *Bergen* v. *Burnett*, in 1804, (Caine's Cas. in Err. 1,) it was contended that the mortgagee is a trustee, and therefore could not purchase. The opinion of the court was delivered by Justice Kent, the inclination of whose mind was evidently against the objection, although he declined deciding on it, as not being necessary in the case. He observes that it is a sound and established rule of equitable policy, that a trustee cannot himself be a purchaser of the trust estate without leave from Chancery, and that it had been so ruled in the case of *Monroe* v. *Allaire;* but he says a distinction was there taken between the case of a suit against a trustee to set aside a purchase, he having procured the formal legal title, and when a suit was by him commenced to complete his purchase, and it was observed that equity would not interfere as of course to set aside the purchase; for although equity will not aid, it is not bound in every case to disturb such a purchaser; and that it is also a question whether the rule would apply to the case of a trustee who was himself a *cestui que* trust, and was obliged to purchase in order to avoid a loss to himself by a sale at a less price. The objection thus raised and not directly passed on by the court, produced the fifth section of the act to amend the act concerning mortgages of the 6th of April, 1808, whereby it is enacted that no title to mortgaged premises derived from a sale under a power shall be questioned, impeached or defeated, either at law or in equity, by reason that the mortgaged premises were purchased by the mortgagee, or his assignee or legal representative, or for his benefit or account,

so that the sale is in other respects regular, fair and with good faith. In fact, the greater part of the purchases under such powers are *and always have been made for the mortgage, and this of necessity; for without the power and right of making the purchase, the security of the mortgagee would be greatly impaired, inasmuch as no one might be present, or from the state of the property or the title, willing to bid to the amount of the incumbrance. The interest of the mortgagor also is best saved by the competition of the mortgagee at the sale, being an open and public one after a long notice. To have decided against such purchases would have hazarded too many titles, and been too much at variance with the received opinion of the best informed lawyers, to have been ventured on lightly. The case of *Jackson* v. *Henry*, (10 John. 185,) is very strong to show the general opinion on this subject. It was a case of sale under a power by an assignee, and a purchase for his benefit in 1805, and after the decision of the cause of *Bergen* v. *Burnett.* The assignee acting in the transaction for himself, was and is one of our most accomplished and able lawyers, of extensive practice and clear perception; and the validity of the sale was not questioned, although the cause was warmly and ably contested. The right of the mortgagee or his assignee to purchase, may also be considered as settled by the case of *Wilson* v. *Throop*, (2 Cowen, 195,) and *Jackson* v. *Colden*, (4 Cowen, 266,) but on grounds more general. I may say with Mr. Justice Platt, in *Franklin* v. *Osgood*, (14 John. 561,) that I have not been able to perceive any foundation in reason or authority for the objection that a *co-cestui que* trust may not purchase for his exclusive benefit. I have not thought it necessary to examine particularly the testimony of General Tallmadge about what took place at the sale, because it standing in opposition to the answer and alone, no decree could be founded on it, because it establishes no agreement, and if it did, it is opposed to the statute of frauds.

Upon the whole, after the most anxious consideration, I

cannot bring myself to believe that the plaintiff has made out a case for redemption. There is certainly an appearance of hardship in his case; but with that judicially I have no concern. I have to test his claim on the broad principles of equity law; and applying those to the best of my judgment, *I think I am bound to decree a dismission of the bill; but I do this without costs, as the understanding of General Tallmadge, the agent of the plaintiff, was a sufficient excuse for the making of the claim.

[*75]

*Bulkley & P. Ruggles,* for appellant:—The assignment of the mortgage to the defendants, was a mortgage of a mortgage on its face. If it had been absolute, it could have been explained by parol. (*James* v. *Johnson*, 6 John. Ch. Rep. 417. *Moses* v. *Murgatroyd*, 1 John. Ch. Rep. 119. *Banker* v. *Prentiss*, 6 Mass. Rep. 430. *Henry* v. *Davis & Clark*, 7 John. Ch. Rep. 40. Same in error, 2 Cowen, 324. *Marks* v. *Pell*, 1 John. Ch. Rep. 594. *Strong* v. *Stewart*, 4 John. Ch. Rep. 167.)

The foreclosure was not conclusive against the complainant; it was only so against the mortgagors. (1 R. L. 373.) The defendants, after their purchase, became trustees for the complainant. They are not entitled to the money paid out for insurance, (1 Hop. 283;) and they are bound to account to the complainant for all the rents and profits, since the sale, they might have received. (2 Mad. 457.)

The complainant is not barred by lapse of time, having made his claim in due season. (2 Mad. 326.) Notice to the agent is notice to the principal. (Amb. 626. 1 Ves. sen. 62; 2 Vern. 574. *Blenkarne* v. *Jennens et al.*, 1 Brow. P. C. 244. *Coote et al.* v. *Mammon et al.*, 2 id. 596.)

The complainant is entitled to redeem, on payment of the amount due, after deducting the rents received; he is also entitled to costs. (*Detillin* v. *Gale*, 7 Ves. 583, 7. 1 Ball & Beat. 121, note, and 264. D'Anver's Ab. 71. 3 Bro. Ch. C. 236. 6 John. Ch. R. 411. 4 John. Ch. R. 78. 1 John. Ch. R. 82. 11 John. 555. 8 Com. Dig. 767, Am. ed. 1

Eden's Rep. 169. 7 John. Chan. Rep. 40. 2 Cowen, 324, S. C.)

*Slosson*, for respondent:—A party can only have relief upon the case made by his bill. The bill alleges neither fraud nor mistake, and therefore the appellant's claim cannot be supported upon either of these grounds. (*James* v. *McKerman*, 6 John. R. 543, 559. *Gouverneur* v. *Elmendorf*, 5 John. Ch. R. 82.) As to the assignment, it is not material whether *it was a pledge or a mortgage; the power of sale passed by it, together with the authority to execute the power. (*Jackson* v. *Blodget*, 5 Cowen, 202. *Green* v. *Hart*, 1 John. Rep. 590. *Jackson* v. *Willard*, 4 John. Ch. R. 43. *Wilson* v. *Throop*, 2 Cowen, 238, 9.) No precise form of words is necessary to confer this power of sale. (Sugden on Powers, 97, ch. 2, sec. 1.) A sale under a statute foreclosure was the one contemplated by the assignment. By the sale, all the rights of Slee were barred. If a stranger had been the purchaser, he would have taken the fee divested of all claims on the part of Slee. On a valid execution of the power, the purchaser is under the original mortgage. (Sugden on Powers, 331, 333. *Doolittle* v. *Lewis*, 7 John. Ch. R. 45, 48. *Duke of Marlborough* v. *Godolphin*, 2 Ves. sen. 61, 73. Co. Litt. 113, a. Litt. sec. 169.) An execution of a power by executors, divests the estate of the heir and all intermediate estates between the testator and purchaser. If this assignment was a mortgage, and the respondents could purchase at the sale, there is a complete change or determination of the relation of mortgagor and mortgagee. If the assignment was a pledge of a chose in action, the title became absolute in the respondents upon default of payment. (*Ackley* v. *Finch*, 7 Cowen, 290. *Brown* v. *Bement*, 8 John. 96.) If the respondents are trustees, they must be so by agreement, or upon the ground that the consideration proceeded from Slee. On the last ground they cannot be; for the consideration did not proceed from Slee. A trust by implication cannot be raised, unless the

[*76]

consideration proceeds from the *cestui que* trust.   (5 John. Ch. R. 19, 20.   2 John. Ch. R. 509.)

The respondents are not trustees by agreement.   There was in the first agreement no prospective trust on a subsequent foreclosure.   The agreement at the time of sale cannot be connected with the original assignment; and it must be governed by the rules of law applicable to such agreements.   Parol evidence cannot be received as to the last agreement.   It is not admissible upon the ground of fraud or imposition.   (*Hall* v. *Shultz,* 4 John. 240.   14 John. 358. 1 R. L. 79.)   The statute of frauds requires all declarations of trust relating to lands to be in writing.   The character of the respondents *as mortgagees became extinguished as soon as they became purchasers.   Slee is precluded from redeeming by delay.   (1 Brown's P. C. 414.   2 Eq. Cas. Ab. 17.)   If a trustee is a *cestui que* trust as to part, he may purchase.   The respondents are at all events only answerable for the amount actually received, and they must be allowed for the money paid for insurance.   (2 Eq. Cas. Ab. 17.   Hoffman's Chan. 241.)

THE CHANCELLOR:   In the opinion of Judge Emott, which is sent up with the other proceedings, agreeably to the rule of this court, he has examined the several questions raised before him with much learning and ability, and at great length.   I regret that the business of this court will not allow me as much time to examine some of these questions as I could wish, especially as on the merits of this case, he has come to a conclusion directly contrary to that of his predecessor, whose opinions are also entitled to great respect, particularly on a question of Chancery law.

One objection, which from the opinions of the judges appears to have been made in the court below, it is not necessary to examine here, as it is now admitted by the defendant's counsel, that the assignment to them from Slee is, on its face, nothing but a mortgage.   Even if the instru-

ment itself was an absolute assignment of his whole interest in the bond and mortgage, this court, from the facts stated in the bill and established in the testimony of Gen. Tallmadge, would be bound to consider it nothing more than a security for the payment of the debt due to the Manhattan Company. From the uniform decisions of this court, many of which have been sanctioned by the court of *dernier resort*, there can be no doubt at this day that parol evidence is admissible to show that a deed or conveyance, absolute on its face, was intended by the parties only as a mortgage or security for the payment of money.[1] (*Clark*

1828.

Slee
v.
Manhattan
Company.

[1] As to the general doctrine, see 2 Cowen & Hill's notes to Phil. Ev. 574—579. In England *Maxwell* v. *Montacute*, 1 Prec. in Ch. 526; *Walker* v. *Walker*, 2 Atk. 99; *Joynes* v. *Stratham*, 3 id. 389; *Vernon* v. *Bethel*, 2 Eden, 113; *Harris* v. *Horwell*, Gilb. Eq. Ca. 11; *Dixon* v. *Parker*, 2 Ves. Sen. 219. In the United States Court, *Hughes* v. *Edwards*, 9 Wheat. 489; *Hunt* v. *Admrs. of Rausmanier*, 1 Pet. 1. New York, *Brown* v. *Dewey*, 1 Sanf. Ch. 57; *Marks* v. *Pell*, 1 John. Ch. 594; *Strong* v. *Stewart*, 4 id. 167; *James* v. *Johnson*, 6 id. 417; *Whittick* v. *Kane*, post. 206; *McIntyre* v. *Humphries*, 1 Hoff. Ch. 31. Connecticut, *Washburn* v. *Merrils*, 1 Day, 139; *Reading* v. *Weston*, 8 Conn. 117, 120, 121, 122; *Dean* v. *Dean*, 6 id. 285. Tennessee, *Brown* v. *Wright*, 4 Yerg. 57. Ohio, *Miama Exporting Co.* v. *U. S. Bank*, 1 Wright, 249. In Kentucky, *Mercer* v. *Blair*, Lit. Sel. Ca. 412; *Thompson* v. *Patton*, 5 Lit. R. 74; *Lewis* v. *Roberts*, 3 Munroe, 409; *Murphy* v. *Trigg*, 1 id. 72. South Carolina, *Irby* v. *Little's Adm'r*, 4 Des. Eq. R. 422; *Todd* v. *Rivers' Ex'rs*, 1 id. 155; *Stinson* v. *McKeown*, 1 Hill S. C. 387. Virginia, *Ross* v. *Norvell*, 1 Wash. 14; *King* v. *Newman*, 2 Mumf. 40. North Carolina, *Streator* v. *Jones*, 3 Hawks. 423; 1 Murph. 449; *Dickenson* v. *Dickenson*, 2 id. 279; S. C. 1 N. Car. Law Rep. 262; *Jackson* v. *Blount*, 2 Dev. Eq. R. 555. Maryland, *Watkins* v. *Stockett's Lessee*, 6 Har. & J. 435; *Wesley* v. *Thomas*, id. 24; *Jones* v. *Leeby*, 5 id. 372. Alabama, *Hudson* v. *Isbell*, 5 Stew. & P. 67; *English* v. *Lane*, 1 Port. 328. Indiana, *Aborn* v. *Bennett*, 2 Blackf. 101. Pennsylvania, *Wharf* v. *Howell*, 5 Binn, 499; *Thompson* v. *White*, 1 Dall. 426, 427.

In New York it was decided, contrary to the doctrine which prevails elsewhere, that a deed or conveyance of personal property, apparently absolute on its face, may, *at law*, be shown by parol evidence, to be intended as a mortgage; not only between the parties, but even in favor of one party against a stranger, if the latter has not acted on the instrument, under the opinion that it is a deed, &c., as it purports to be. *Walton* v. *Cronly's Admrs.*, 14 Wen. 63; *Gilchrist* v. *Cunningham*, 8 id. 641; *Ring* v. *Franklin*, 2 Hall's N. Y. S. C. 1. But see per *Nelson*, J., in *Patchen* v. *Pierce*, 12 Wen. 61, 64,

[*78]

v. *Henry*, 2 Cowen, 324; *Ross* v. *Newell*, 1 Wash. R. 19.) Of the various questions raised by the counsel on the argument, I consider it necessary to examine a few particularly.

*It is insisted by the appellant's counsel, that the assignment to the defendants gave no authority to them to foreclose the mortgage under the statute, or to give a conveyance on the sale which would bar his equitable right to redeem the lands in the hands of the purchaser. On this question I perfectly agree with the learned judge whose decree is appealed from. It was undoubtedly the intention of the parties that the defendants should have the right to foreclose and sell the mortgaged premises under the statute, for the purpose of barring the equity of redemption which existed in Frear and Hallowell, if they thought proper to pursue that course, instead of resorting to a court of equity.

The assignment was a mortgage of the power of sale, as

who seems to have thought that such proof was proper in equity only, and upon the assumption of fraud in the grantee, &c. This opinion was sustained by the Court of Errors in *Webb* v. *Rice*, 6 Hill, 219, and followed by the Supreme Court in *Bishop* v. *Bishop*, 4 Barb. S. C. R. 138. These decisions overrule all previous ones, and assimilate the rule in New York to that in England, and to most of the other states. As equity powers are now vested in courts of law in this state, and the Court of Chancery abolished, the powers incident to both may be exercised by the Supreme Court, according to circumstances, as in Pennsylvania. Whether this will give to the Pennsylvania decisions on this subject greater weight in this state remains to be seen. Heretofore the Pennsylvania decisions were, as Judge Cowen remarks, (2 Cowen & Hill's notes to Phil. Ev. 578,) not always safe guides on the subject of oral evidence, in respect to written instruments, when the inquiry is simply as to the rule *at law*. In the main, they agree with the decisions in equity; but to one accustomed to see the distinction between Chancery and strict legal powers preserved in some way, they require to be read and used with more than ordinary caution, from the fact, that while the proceedings present all the external appearance of a suit at law, the judgment, in many instances, involves principles peculiar to a court of equity. Thus, judgment will sometimes be rendered for the plaintiff in an action of ejectment, when a Chancellor would enforce a performance for an agreement of the land, or decree a conveyance.

well as a mortgage of the debt. The authority to execute the power was vested in the defendants by the mere act of assigning the legal interest in the mortgage. It always passes with the legal estate and debt, unless there are some words of restriction. If the defendants, in the fair execution of the power, had sold and conveyed the premises to a stranger for one half the amount of their debt, Slee would have been bound to pay them the balance, and would have had no claim to redeem the mortgaged premises from such purchaser. He must have understood that the defendants had a right to foreclose under the statute. The premises were advertised and sold with his full knowledge of the facts, and he made no objection that they were not authorized thus to proceed.

The defendants, being the holders of the legal estate, if they sold and conveyed the equity of redemption of Frear and Hallowell to a third person under the statute, it necessarily follows that the legal title would also pass with it by the conveyance to the purchaser, and the whole estate which existed in Frear and Hallowell, previous to the giving of the mortgage, would again become united in such purchaser.

The same effect would be produced by a foreclosure of Frear and Hallowell's equity of redemption by a sale under a decree of this court, to which Slee was not made a party. A stranger purchasing under the decree, would unite the legal estate which is in the defendants with the equity of *redemption of Frear and Hallowell sold under the decree, and thus acquire the whole estate which existed in the mortgagors previous to the giving of their mortgage. In either case, Slee's claim upon the land would be divested by the sale, and the purchaser would hold it clear of all incumbrance. In neither case, however, would there be any foreclosure of the second mortgage which was created by the assignment. That would still be open to redemption by him; but his equity of redemption would then attach itself to the money for which the land was sold,

[*79]

instead of the land itself. But the effect of a sale either under the statute, or under such a decree, where the mortgagees of the bond and mortgage became themselves the purchasers, is entirely different. In that case, they only purchase the equity of redemption which existed in the original mortgagors, and the equity of redemption of the assignor still continues to attach itself to the legal estate, which remains unchanged in the purchasers, except that it is discharged of the equity of redemption of the original mortgagors, which, by the foreclosure, becomes merged in the legal estate. Thus, in *Jackson* v. *Colden,* (4 Cowen, 266,) under a statute foreclosure, where the holder of the legal estate or mortgagee himself became the purchaser of the equity of redemption, it was held that no deed was necessary to make his title to the premises perfect.

In this case, the equity of redemption of Frear and Hallowell was all that was or could be foreclosed by the sale under the power contained in the mortgage. That equity of redemption being purchased in by the defendants, the legal estate was in their hands, and Slee's equitable claim thereon remained untouched by that foreclosure. And it makes no difference, that the purchase of Frear and Hallowell's equity of redemption was made through the intervention of a third person; for by the operation of a resulting trust, the defendants never have been divested of the legal estate. No interest or estate whatever vested in Gen. Tallmadge, even for an instant. The plaintiff's equity of redemption was therefore never separated from the legal estate, which has remained untouched in the hands of the defendants ever since the assignment of the mortgage to them in August, 1819. But even if the legal effect of this [*80] purchase by the defendant's *attorney were otherwise, this court would never permit such a circumstance, whether the same was accidental or intentional, to defeat the natural and equitable effect of a purchase by the defendants of that outstanding equity of Frear and Hallowell.

In this view of the case, it becomes necessary for me to

examine many questions which have been raised, and par-
ticularly the one as to the admissibility of the evidence of
Gen. Tallmadge respecting the agreement made a short
time previous to the sale. The parol agreement made by
him on behalf of the defendants, at that time, with the ex-
ception of the promise on his part to bid to the amount of
their debt, if necessary, was precisely what I have found to
be the legal effect of the assignment and foreclosure, and
the rights of the respective parties, if that agreement had
not been made.

Again, the purchase of Frear and Hallowell's equity of
redemption accrued to the benefit of Slee on the well known
principle of equity, that where the mortgagee has gotten a
renewal of a lease, or obtained any other advantage, in
consequence of his situation as such mortgagee, the mort-
gagor coming to redeem is entitled to the benefit thereof.

The assignment of the bond and mortgage, being a sub-
sisting mortgage, and the appellant's equity of redemption
not being divested by the statute foreclosure, the question
of waiver on account of the lapse of time, does not arise.
This assignment by way of mortgage bears no analogy to
a pledge of stocks or of personal property, for the purpose
of securing a debt. The original mortgage was a specific
lien on the land, and the assignment carried even the legal
estate itself to the defendants. It must, therefore, be gov-
erned by those rules which are applicable to other mort-
gages of a legal or equitable interest in real estate. This
was so considered by this court and the Court of Errors in
the case of *Clark* v. *Henry*, before referred to. In such
cases twenty years at least is required to bar the equity of
redemption.

Law and justice both concur in this case in enabling me
to declare, that Slee's equity of redemption in the premises
is neither barred by the sale under the statute nor by the
lapse of time; and the decree of the circuit judge dismiss-
ing *the complainant's bill is therefore erroneous, and must          [*81]
be reversed.

As the defendants admit in their answer, that they have been in possession of the premises by themselves or their tenants ever since the sale on the 10th of November, 1817, they must account for the rents and profits which they have or might have received. But under the peculiar circumstances of this case, I think they are entitled to an allowance for the insurance which was *bona fide* effected by them on the property, previous to Slee's application to them to redeem in January, 1825, and for all sums expended for taxes or repairs of the premises. They are also entitled to the costs of foreclosing the equity of redemption of Frear and Hallowell.

As to the costs, the general rule is, that on a bill to redeem, the plaintiff pays costs to the mortgagee, although he succeeds in obtaining the relief claimed. There are, however, exceptions to this rule; and where the mortgagee has set up an unconscientious defence, he has not only been refused his costs, but has been compelled to pay costs to the other party. (*Shuttleworth* v. *Lowther*, 7 Ves. Rep. 587. *Harvey* v. *Tebbut*, 2 Jac. & Walk. 197.) The case of *Henry* v. *Davis & Clarke*, (7 John. Ch. Rep. 40,) in this court, the decree in which case was afterwards affirmed in the Court of Errors, is one of this description.

In this case, the defendants have refused to permit the appellant to redeem, notwithstanding the directors were informed of the positive promise of their attorney and agent that he should have that liberty, and have compelled him to resort to this expensive litigation. I shall therefore allow him the costs of the proceedings in the equity court, and give to neither party any costs as against the other on the appeal in this court, or of the subsequent proceedings here.