BENTLEY, (DOUGHERTY v.) See Case No. 4,024.

## Case No. 1,331.

### BENTLEY et ux. v. PHELPS.

[2 Woodb. & M. 426.] [1]

Circuit Court, D. Massachusetts. May Term, 1847.

MORTGAGE—WHAT CONSTITUTES—DEED ABSOLUTE ON FACE—EVIDENCE—STATUTE OF FRAUDS.

1. Where a deed is absolute on its face, it is competent to show, in a bill in equity, that it was a mortgage, by proving confessions of the grantee that it was a mortgage, and that a deed of defeasance was to be given and filed with it, so as to constitute the transaction a mortgage; by proving receipts of money subsequently from the grantor and her representatives, for interest, and in amounts corresponding to interest rather than rent; by possession long after the conveyance retained by the grantor; by the relation of debtor and creditor, admitted to have then and long before existed between them; and by the value of the property being larger than the consideration advanced.

[Cited in Almy v. Wilbur, Case No. 256; Jewett v. Cunard, Id. 7,310; Tufts v. Tufts, Id. 14,233. See, also, Hughes v. Edwards, 9 Wheat. (22 U. S.) 489; Sprigg v. Bank of Mt. Pleasant, Case No. 13,257; Chickering v. Hatch, Id. 2,672; Sprigg v. Bank of Mt. Pleasant, 14 Pet. (39 U. S.) 201; Russell v. Southard, 12 How. (53 U. S.) 139; Rhodes v. Farmer, 17 How. (58 U. S.) 464; Wyman v. Babcock, Case No. 18,113; Babcock v. Wyman, 19 How. (60 U. S.) 289; Graham v. Sheken, Case No. 5,675; Amory v. Lawrence, Id. 336; Andrews v. Hyde, Id. 377; Howland v. Blake, Id. 6,792; Dow v. Chamberlain, Id. 4,037; Jones v. Guaranty & Indemnity Co., 101 U. S. 622.]

2. These are each admissible for this purpose, and are not forbidden by the statute of frauds in such a case.

[In equity. Bill by Thomas Bentley and wife against Abner Phelps to have a deed absolute on its face declared a mortgage. Decree for complainants.

This bill was filed in August, 1845, alleging that Hannah Jones, the mother of the wife of the complainant, was, during her life, seized of certain premises in Boston, on Richmond and Ann streets, containing about four hundred square feet of land, with the buildings thereon; that she was indebted to the respondent Phelps, in the sum of $165, and gave a mortgage of these premises to secure

it Sept. 22, 1824; that she paid the same, and in January, 1827, borrowed of Phelps $567, to secure which she conveyed to him, in fee and absolutely on the face of the deed, the same premises, but as then designed and agreed, in mortgage, to secure its repayment and interest thereon quarterly; that in pursuance of this agreement and understanding between the parties to that deed, she continued in possession of the premises till her death, in Sept. 1832; that in the mean time she expended a large part of the $567 in repair of the buildings, and paid the interest thereon quarterly, both parties treating the deed, as stipulated, to be a mortgage, and a mere security for the debt; that after her death, in 1832, Hannah McLean, mother of Mrs. Jones, and grandmother of the wife of the complainant, who is daughter of Mrs. Jones, and her sole heir, and a minor then as well as at the time of filing this bill, took charge of the premises as her guardian and administratrix of the estate of Mrs. Jones; that Mrs. McLean continued to treat the premises as under mortgage to Phelps, and he to receive from her interest on the debt and principal, till, on the 23d of July, 1834, only $450 remained due, as stated by Phelps; that she continued to occupy or receive the rents therefor, and make payments of portions of the interest and principal due to Phelps, till 1841, when he excluded her therefrom; and that the wife of the plaintiff, then a minor, and so in 1843, married him, and since that event they have repeatedly demanded of Phelps to account for the rents and profits, and come to a settlement of the mortgage, and pay any balance due to them, or receive any due to him, and reconvey the premises to her as heir of Mrs. Jones. It was further averred, that Phelps refused to consider the transaction as a mortgage, and to come to any settlement thereof, and, after putting to him several interrogatories, the bill concluded with a prayer that, after answering them, he be required to account for his receipts, and reconvey the premises on receiving any balance due, and also pay over the surplus, if any he may have received.

One answer was put in and excepted to for improper matter inserted by the respondent, and, after amendment, the averments in it, which it is material to repeat, were these: That he loaned to Mrs. Jones $165 in Sept. 1824, and took the mortgage first described in the bill; that in 1825 he loaned her $185.61 more, most of which was expended in repairs of the buildings on the premises, then much dilapidated; that she continued in possession thereof till Jan. 29, 1827, when she owed him $367, principal and interest, and proposed to sell and convey to him the premises for $200 more, making in all $567, which last sum he then advanced to her, and took an absolute deed of the premises; that it was then the full value of them, and the note he held against her was given up; that there was no

[1] [Reported by Charles L. Woodbury, Esq., and George Minot, Esq.]

agreement to treat this last deed as a mortgage, nor had Mrs. Jones any expectation it would be, nor had he ever said it was to be so treated; that Mrs. Jones remained in possession under a written lease to pay $55 per year, rent and taxes, but not otherwise; that she never paid him interest after the conveyance in 1827, but small sums as rent between that time and her death in Sept. 1832, which were indorsed on the lease, and amounted in all to $86.19, leaving a balance due for rent of $248.18, beside the taxes; that in Sept. 1832, after her death, finding her mother, Mrs. McLean. in the house, he consented at her request to let her continue to occupy it, on the same terms. and her promise to pay off as much as she could of the balance due from her mother; that Mrs. McLean paid more than the rent for a few years, and in 1841 she had discharged in all $350.29, which, with Mrs. Jones's payments, amounted to $436.48, leaving $374.76 due on the lease, besides interest and taxes; that he then notified her to quit the premises, which she did without complaint; that he never settled with her, and if he told her the balance due to him was $450, which he denies, it was conjectural, and related only to what was due for rent and on the lease, and not to any other debt, as none other existed; that the real sum then due for rent and taxes and interest thereon was $582.80, and has never been paid, nor any statement made by him to Mrs. McLean or others, that the previous deed was a mortgage, or meant to be; that he never promised to reconvey the premises. when the sum named in the last deed and interest thereon were paid; and that the wife of the complainant came of age before her marriage in A. D. 1832, and is admitted to be the heir of Mrs. Jones, and was under the guardianship of Mrs. McLean. The answer was sworn to.

The testimony printed consisted chiefly of the depositions of Mrs. McLean, Samuel Bell, and Mr. Page, with several receipts and cancelled notes. Such portions of them as are important are referred to in the opinion of the court. At the hearing, the respondent by agreement put in a copy of the original mortgage, and of the subsequent absolute deed to him by Mrs. Jones, and the duplicate of the original lease to Mrs. Jones, with several indorsements therein, which are referred to below.

The cause was argued at this term by John A. Bolles, for complainants, and Bradford Sumner, for respondent.

WOODBURY, Circuit Justice, delivered the opinion of the court. He said that the task of the court in settling the leading facts in this case was embarrassing; not so much from the doubt how the balance of the testimony stands on the face of it, as from the great errors in memory, which the collisions of the testimony disclose, if not some more painful conclusions in respect to portions of the answer. As some apology for the respondent, however, the transaction is one obscured by time, a whole generation having passed since the deed in controversy was given; the only witnesses are also very aged, and some of them nearly related to the complainants; and the respondent himself, after twenty years, would naturally rely more on the written papers as to what the transaction really was, than on any obscure or imperfect recollections of any thing differing from them. Under all these considerations, the case is likely to be surrounded with some doubt in respect to such remote facts; and this would be peculiarly so from various circumstances being not reconcilable with the hypothesis assumed on the one side or the other, and there being two or three important and direct contradictions between the answer and the witnesses. But the latter, beside their number, seem the most strongly sustained by some of the written documents. These last are less forgetful than men; less open to improper influences; and if tampered with, less able to conceal it; and the facts compel me to say, that they tend in the main directly to support the positions of the complainants.

An analysis of the evidence will show how this matter really stands. The material facts admitted should be distinguished from those which are controverted, as the former alone possess much weight independent of the others. Those which are material in deciding, whether the deed of 1827 was intended to be a mortgage between Mrs. Jones and Dr. Phelps, and which are admitted on both sides, consist, first, of the continued possession of the premises by Mrs. Jones or others under her, from that time till her death, in 1832; and a like possession by Mrs. McLean, the guardian of her daughter and heir, from that time till 1841. Next, it is the relation of borrower and lender, which had existed between these parties from 1824 up to the date of that deed, if no longer. Finally, it is the exercise of all acts of ownership by Mrs. Jones and the guardian in letting the premises to others, or making any temporary repairs from 1827 to 1841; and the absence of any by the respondent, except the lease to Mrs. Jones for one year at the commencement of A. D. 1827.

The next material facts controverted will next be considered. They are, 1. The value of the property in 1827 as compared with the consideration set up for a sale, whether much more or not. 2. The payment of money to the respondent by Mrs. Jones and Mrs. McLean, and the receipt of it by him during that period, whether as interest on a mortgage or rent on a bona fide lease of what he had bought absolutely. 3. The actual execution of a defeasance to Mrs. Jones in 1827, with a view of making the deed from her a

mortgage. 4. The admissions by the respondent or not, that it was intended to be a mortgage, and was so considered by him, as well as by Mrs. Jones and Mrs. McLean. 5. The continuance of the relation of borrower and lender even in and after 1827. Now, in respect to these controverted facts, there were generally on the side of the respondent no witnesses and no evidence, but his own oath in his answer; and it ought to be added, some prima facie presumption in his favor which arises from the face of the deed and lease, and of a few of the receipts. But it is to be remembered, that the written papers of the grantee belonging to the transaction itself, and more especially the deed, are not in a case like this to possess the controlling influence, which is imparted to them in regard to most other contracts. Because the truth of the face of the deed is the very fact in controversy, and if its face be at all conclusive, no mortgage would in any case be allowed to be proved either by other writings or by parol independent facts in pais in chancery, any more than at law.

It is well settled, however, that in chancery, as this case now is, the parties are allowed to show by parol as well as other writings, notwithstanding the conveyances are absolute on their face, such other facts as may render it probable a mortgage was intended. And hence it follows, that the form of the papers makes only a prima facie case, and is not to stand against other facts, which satisfy the court, that in reality a mortgage between the parties was probably contemplated. The parol evidence is thus allowed, not to show here, that the deed was made absolute by mistake or accident, when it was meant to be conditional; but that it was by design made absolute, while in truth the real transaction as a mortgage was thus intended to be concealed or covered up. or be left to a separate defeasance. And the other party undertakes to show this from separate writings, or from certain independent distinct facts and doings between the grantor and grantee, which courts of chancery will consider and give to them their due weight in conjunction with the written evidence of the deed the other way, and the oath of the party and any thing else corroborative on his part. This course does not conflict with the statute of frauds, when it proves other written papers making the deed or mortgage, or adduces independent facts which show the face of the deed to contain a mistake or a fraud, or not the whole truth.

The first material controverted fact is the value of the premises compared with the debt or sum advanced. The only testimony on this for the respondent is from himself in his answer. It is that the sum due to him was $567, equal to the full value of the premises at that time. There is no other proof, except his oath and the consideration named in the deed, that Mrs. Jones then even owed him so much as $567, by $150 or $200. The previous notes and advances fall short of this consideration to that extent, and no note or receipt, or witness, except as aforesaid, shows any thing either more or less. The bill in this respect, and in one or two others, varies from the proof, though not so as to require amendment. Inclining on the weight of the testimony, however, to hold that the true sum was $567, for the purpose of this inquiry, and to be composed of $367 old debt, and $200 new, there is the positive testimony of two witnesses against his answer as to the value being no greater. They show that this sum was not equal to more than half or one third the value of the premises. Mrs. McLean had bought them ten or twelve years previous, and given $1300 for them. Mrs. Jones had in the year before this conveyance expended on them in repairs $180 more, with money borrowed of Phelps. Before those repairs, Mrs. McLean testifies they were worth $1300, and are now, A. D. 1846, worth $1600 to $2000; and Mr. Bell swears they are now worth $1000. From all this, however meagre, compared with what could be proved on either side, and probably would be, if this was not correct. little doubt exists, that in 1827 the premises were worth from twice to three times the consideration paid; and this fact, therefore, raises a strong presumption in equity that the transaction was a mortgage, and not an absolute sale. One party will not readily be presumed so foolish as to sell outright for half or one third what his property is worth; nor the other so unconscionable as to buy at that depreciation, when other circumstances combine with this to render the sale a mortgage, and thus make both behave naturally and justly.

But there is another piece of testimony still more striking connected with the income derived from this property, and thus showing something as to its true value. Beside the land, which has been made in argument the basis of its value, buildings existed, which were rented by Mrs. Jones for $120 a year once, by Mrs. McLean for $200 once, $175 once, and $150; and by Phelps once at $156. Now the value of this rent would be not merely the four hundred feet of land, but buildings, which, though old, had been well repaired by the money borrowed of Phelps, and rented at the rate of six per cent. on a capital of from $3200 to $2400. This is subject to some deductions for insurance, taxes, &c., but still increases the improbability of an absolute sale for $567, of what cost near twenty years before $1300, and yielded a rent at least equal to six per cent. on more than $2000. On the hypothesis that this was an absolute sale, Mrs. Jones parted with premises for a sum, whose interest was only $34.02, which yielded her an interest or income at that time at least of $150 yearly, or from four to five hundred per cent. more. But supposing it was done in the form of

an absolute sale merely to secure the payment of her debt and interest, and to prevent any creditor of hers from attaching the equity of redemption, as Mrs. McLean testifies Phelps admitted to her, and the transaction becomes more natural and explicable on ordinary principles; and is another piece of corroborative testimony, that the equity of redemption was considered worth something, and the sum loaned by no means equal to the value of the premises; otherwise, a resort to this course to prevent attachment would not have been thought necessary.

The next controverted fact as to the subsequent payments, whether for interest or rent, is very material, because, if actually paid and received as rent, it would indicate that an absolute sale had been intended to be made. Whereas, if the payments were for interest, they would furnish strong evidence that a mortgage was understood to be existing, and meant to exist rather than a sale. The very first payment which appears in the evidence to have been made by Mrs. Jones, was Aug. 6, 1827, or about seven months after the deed was executed, and is stated by Phelps and entered originally on the back of the duplicate lease in his possession, without saying whether it was for interest or rent. I say originally, not merely from the appearances of the paper, the color of the ink, and the punctuation, but the positive evidence of three witnesses, who are experts as to handwriting, and are contradicted by none on the part of the respondent, but are sustained by the appearances on the paper just referred to. Such alterations may have been made at the time and by assent of parties, and different colors in the ink may exist in the same writing, by dipping a pen deeper. Hence I did not and do not now think it expedient to decide such a question without proof dehors. That proof is very direct and strong. The apparent alterations, too, are all in such parts, and such only, as to affect this question in dispute; and however disagreeable it may be to find this matter unexplained, my duty is now merely to follow where the positive evidence requires me to go. This evidence is, that a manifest alteration has since been made in this first written receipt by some person, adding the words "rent" and "lease." So in the next receipt on the 8th of October, neither "rent" nor "interest" was named in that originally, but these witnesses testify that "rent" has since been added. So again in the receipt of Jan. 15, 1828, and July 29th. Again, the receipt on the 29th of April, 1830, was originally "interest to this date," which it is proved has been erased, and "rent three dollars" added. And Oct. 29, 1830, "interest" was in the receipt at first, and has been since erased and "rent" substituted. It is not very probable that these additions and these erasures have been made for any purpose than to prevent the inference, which would arise from them as they stood originally, that the deed and lease had been a mere mortgage in design, to secure the debt and interest. If meaning otherwise, it is probable that the receipts would have been originally in terms for rent, and rent alone; and not as they were, in no case, for rent, but in two of them expressly, ipsissimis verbis, for "interest."

It is not shown, that any person had a motive to make these alterations but the respondent, and the receipts have been in his possession till produced in court. Apparently, and such is the evidence, they are alterations of a subsequent date to the original entry, but in the same handwriting. The court do not decide on the author of them, or the guilt of them, in this collateral inquiry, for it is possible they were afterwards made by consent. But there is no such proof, and it is enough to say here on the proof which exists, that as the receipts appear to have stood originally, they furnished strong evidence that the payments made by Mrs. Jones were as "interest," and were so received by Phelps, and are thus a species of evidence, and written evidence, very decisive that the relation of mortgagor and mortgagee was understood and meant by both parties to continue between them.

Another circumstance connected with these payments by Mrs. Jones, showing them to have been for interest, is that the nominal rent reserved in the lease was $55 per year, whereas the interest on the $567 she is claimed to have owed Phelps in January, 1827, is only $34.02; and on examination it will be found that it was near the amount of interest, and not of the nominal rent, which she paid yearly till the payment stopped in the latter part of 1830. They exceed the amount of interest only small fractions, which were probably added for not being made punctually at the end of each quarter. The difference between that and the nominal rent reserved yearly is about twenty-one dollars, or over one third the whole sum, and is hence the more striking as a payment in reference to interest rather than rent. Beside this, a quarter's interest is eight dollars and a fraction, whereas a quarter's rent would be $13.75; and the last sum is not in one instance out of the eleven payments made by Mrs. Jones the amount paid, or any thing within three to four dollars of it, while in six or seven of the eleven payments, the amount was eight dollars and a fraction, differing only a few cents from a quarter's interest, but falling short of a quarter's rent about five dollars in each of those cases.

Following the payments further after the death of Mrs. Jones, the same evidence exists in some respects that they were made for interest, with some additional corroboration of it, and on the contrary with some counter data. Thus Mrs. McLean within a few days after the death of Mrs. Jones, testifies that she called on Dr. Phelps as to the premises, and he admitted they were held as mere security for the payment of the principal and

such interest as Mrs. Jones had not paid. When these were satisfied, he was willing to reconvey them. He assented to her continuing to occupy them as Mrs. Jones had; and she thereupon did occupy them, and at once commenced making payments on what she considered the mortgage debt. Dr. Phelps, in his answer, denies so much of Mrs. McLean's testimony as relates to there being any mortgage, and insists that Mrs. McLean was to remain there as if under the lease to Mrs. Jones, continued to her, and on her undertaking to pay also the arrears of rent due from Mrs. Jones, and not the arrears of the mortgage. In this conflict of testimony on these points between the respondent and Mrs. McLean, it will be necessary to turn to the written evidence between them as supporting either.

The very first receipt to Mrs. McLean, Sept. 12, 1832. the same month her mother died. is "$14.50 towards the interest." This receipt has been in her possession, and has no appearance of alteration, and is strong evidence of a mortgage. But the next one, Oct. 29, 1832, is for $32.50, "being the last quarter's rent, and the rest on the debt due." This is the first mention of rent originally in a receipt, since the deed was given in A. D. 1827; but this is accompanied by the expression of "debt due." This last expression would be evidence of a mortgage debt being thus recognized, if Dr. Phelps did not insist it referred to the debt due from Mrs. Jones for rent. Mrs. McLean, however, testifies it was the debt due on what she considered as secured by the deed of 1827, and which Phelps told her was meant to be a mortgage. She is fortified in her position not only by the first receipt having been for interest, but by the third receipt, Jan. 19, 1833, which is $7.50, "the interest. and the rest $8 on the debt," the word "interest" not applying to rent, but to interest on the mortgage, and the debt named in connection with it being probably the mortgage debt. The amount paid for interest strengthens this view, as being quarterly it would far exceed the amount of interest on Mrs. Jones's arrears for rent, even as computed by Dr. Phelps at $248.18, principal and taxes, and would approach near to the interest on the original debt of Mrs. Jones for money borrowed, considering that a part of the principal had been discharged by Mrs. McLean. The amount of principal so discharged by her within a year and a few months appears to have exceeded $100, leaving only about $467 debt, the interest on which quarterly would be a fraction over seven dollars. Accordingly, as a remarkable verification of her statements, we find in five or six subsequent cases, that her payments amount to seven dollars each and a fraction, or fifteen dollars and a fraction, apparently to cover in the first instance one quarter's interest on the mortgage debt, but in the second instance, two quarters, but not at all agreeing with the position taken by the

respondent as to rent. During 1833 and part of 1834, some of the receipts speak of interest alone, and some of interest and debt, some rent and interest, and some rent alone. But on July 23, 1834, Dr. Phelps gives a receipt in a still more striking form for a certain amount, "being the interest and $14 on the principal, which leaves now due me $450." This indicates in its terms a mortgage debt most strongly, and agrees with what would then be the amount of that debt, reduced as before mentioned, and not with any debt of Mrs. Jones for rent alone.

Furthermore, Mrs. McLean testifies it was given on her request to have a statement of the amount due on the loan to Mrs. Jones, secured by mortgage. Numerous subsequent receipts to Mrs. McLean are all for "interest" or "interest and principal," or "rent and interest," or "principal," or "rent or interest," considering it the same in at least three of the receipts. They continue down to 1839, and as the principal debt had become still further reduced. the quarter's interest is only $6.50, or $6.25, instead of $7 and a fraction, or $8 and a fraction, indicating in this way again, that the payment was not as a mere tenant for a fixed rent as rent, but the payment of interest as a debtor, or for a debt, and hence varying in amount as the principal debt varied. It is also a remarkable circumstance, that not one of all these payments during fourteen years corresponds in amount annually, semi-annually, or quarterly with the nominal rent reserved of $55 per year, or with the $100 per year, nearer its true value as rent, but most of them correspond with the interest on the mortgage, indicating that as the guide and standard in the minds of both parties.

The next controverted fact bearing on the question, whether the deed of January, 1827, was intended to be a mortgage, is the actual execution of a defeasance in writing testified to be admitted by Phelps, to have been made and filed away with the deed, so that in case of his or Mrs. Jones's death, written evidence of the designs of the parties might exist. In relation to this fact. there is on the one side the denial of Phelps under oath, and against it the express testimony of Bell and Mrs. McLean, as to Phelps's positive statements to that effect in detail.

It may be proper to say here, once for all, that since Mrs. McLean's near relationship to the complainants would cause her evidence to be scrutinized more closely, and especially where it was contradicted by other evidence from persons not related to the opposite party nor interested. her evidence might in such case require corroboration from others in order to deserve full credit. But here she is contradicted only by the party in interest. and is fully sustained by another witness. In relation to her and Mr. Bell, as persons advanced in life, and hence excepted to as being more frail in memory, it is certain that as to recent transactions,

such persons notice them less and think of them less, than events in early life. But if, as in this case, they are not deaf so as to prevent hearing, and took a deep concern as in a matter like this, interesting to them and their near friends, and profess to remember it, the confidence due to them is not to be diminished on account of their age, and should in some cases be greater, from their nearer approach to future accountability for false swearing, though not actually in articulis mortis. I am bound then to believe them in this as in other parts of their evidence, where their recollections are distinct and positive, and not impugned by any other witness, but merely by the party in interest, and sustained as they are by most of the receipts and other facts. Carpenter v. Providence Washington Ins. Co., 4 How. [45 U. S.] 185.

It must be considered proved, that this deed, though absolute on its face, was made actually a mortgage by a written defeasance. Whether it was sealed or not, or bore date with the deed, or was formally delivered, is not very material in equity, however it might be in law. See Shapley v. Rangeley, [Case No. 12,707;] Brown v. Brown, [Id. 1,994.] But beside the admissions of Phelps as to the existence of such a defeasance, there are others in respect to the deed in 1827 having been a mortgage, testified to not only by Bell and Mrs. McLean, but by Page. The latter, learning that the respondent had obtained a title to the premises, and wishing to purchase them, called on him for that purpose, after Mrs. Jones's death; Phelps explained that she had been indebted to him, and wanted more money, and he declined letting her have it without an absolute deed, which she gave, but if "they paid the interest promptly, he did not feel that he had any moral right to sell." If they did not, he should, but declined selling then. This not only shows a substantial admission to Page, such as he made again and again to the other two witnesses, that the transaction was a mortgage in a moral or equitable view, but admits that the character of a loan belonged to the money advanced in Jan. 1827, as well as before. All the receipts for interest also indicate this strongly. Again, Phelps was not a person wanting to buy in 1827, any more than in 1824; but when hearing that Mrs. Jones wished to borrow, he called on her to lend to her the money, as Mrs. McLean testifies. So in 1827, his was rather the character of a person willing to lend more, and actually doing it, on having the security for it put in a form more safe and acceptable to him. This fact is usually one of the great touchstones, whether a deed was really meant to be a sale or a mortgage. See 3 Pick. 483; Eaton v. Whiting, Id. 491.

Having gone through with this analysis of the testimony on what is material and controverted, it may be remarked generally, that in chancery money transactions are by means of such evidence considered as mortgages, which are not always so at law. On this see 4 Mason, C. C. 444, [Picquet v. Swan, Case No. 11,133;] Flagg v. Mann, [Id. 4,847;] Shapley v. Rangeley, [Id. 12,707;] Almy v. Wilbur, [Id. 256;] 3 Pick. 490; Jenkins v. Eldredge, [Case No. 7,266;] Kelleran v. Brown, 4 Mass. 444. And furthermore, that the objection of the statute of frauds does not apply to any of this evidence which is in writing, or which goes to prove by parol, either independent facts and not mere contradictions of the deed itself, or loss of papers, or fraud.

Our course is next to review and discriminate what particular facts are admitted or satisfactorily proved, which tend to show that the deed of 1827 was actually intended by the parties to be a mortgage, and which are by adjudged cases deemed competent for that purpose in a court of equity. 1. A defeasance was written and lodged with the deed, in order to evince and secure that effect in case of the death of either party. And the form of an absolute deed was said to be adopted not because the premises had been sold, but because the equity of redemption might be attached by creditors of Mrs. Jones, if it appeared on record as a mortgage. That such evidence is competent in chancery, as tending to show not only the existence of a defeasance but its loss, either by accident or fraud in not producing it, the cases are numerous, and even go to the allowance of proof of a promise to give such a defeasance, and the presumption of fraud or accident if it was not done. 1 Pow. Mortg. 120, note; Joynes v. Statham, 3 Atk. 389; Taylor v. Luther, [Case No. 13,796;] 2 Sumn. 528, [Flagg v. Mann, Case No. 4,847;] 4 Kent, Comm. 143; 1 Paige, 48; 9 Wend. 237; Jenkins v. Eldredge, [Case No. 7,266;] 4 Russ. 425; 4 East, 577, note; 2 Jac. & W. 182. The greatest doubt under this head is in cases generally whether the agreement to reconvey in a certain event was intended to make the transaction a mortgage, and was evidence of its being so; or was a mere special contract to reconvey on condition, and hence not binding unless the condition was strictly performed. If there had been no previous loans between the parties, and the case grew out of a treaty to sell and buy, or the conditional agreement was of subsequent date, the case is usually not a mortgage. [Conway v. Alexander,] 7 Cranch, [11 U. S.] 237. But if these, or other strong facts are the reverse, as here, the inference is in favor of its being a mortgage. 10 Sim. 386; 3 Jur. 1186; 5 Jur. 114; 4 Kent, Comm. 143.

2. The next special fact thus proved or admitted, and very material in this inquiry, is, that the parties stood here in the relation of lender and borrower, both before and at the time of the execution of the deed in 1827. Such a circumstance is deemed very decisive in a court of chancery, that the transaction

was meant to be a mortgage. Flagg v. Mann, [Case No. 4,847;] 1 How. [42 U. S.] 318; 4 Johns. Ch. 167; and other cases in Hunter v. Marlboro, [Case No. 6,908;] Co. Litt. 204, b, and note. Her first application, in 1824, to a broker, and afterwards to Parkman, was not to sell the premises, but mortgage them; and his intention had never been to buy, but to make loan after loan, till beside a mortgage at first for what was then advanced, he proposed not to buy, but to take an absolute deed to secure the whole, making, as he averred, a defeasance back, and lodging it with the deed for her security as to the right of redemption. Morris v. Nixon, 1 How. [42 U. S.] 118. Whenever the deed is in fact security for a debt, courts are inclined to consider it a mortgage. Porter v. Nelson, 4 N. H. 130; Longuet v. Scawen, 1 Ves. Sr. 406; 4 Kent, Comm. 158; 3 Pick. 483, 491. The only doubt as to the force of this point is the surrender to Mrs. Jones of her notes, and the taking of no new one, or a bond, or covenant to pay the money advanced and due. But if a transaction be shown to have been a mortgage, a suit lies for the debt, though there be no note, or bond, or express covenant to pay it. 1 Pow. Mortg. 16, note; Id. 374, note; King v. King, 3 P. Wms. 361. It rests on the whole evidence, showing it to be a mortgage; and if a right to redeem exists, there is a correlative right to enforce payment, and treat the case as a debt thus secured. But if, vice versa, from the nature of the transaction, there is no loan, no debt, no borrowing, then there being no debt, there is no mortgage, and no action lies to recover a debt. [Conway v. Alexander,] 7 Cranch, [11 U. S.] 237. I speak now, of course, of moneyed considerations in deeds and between the parties, and not mortgages to secure against contingencies or liabilities as bail, or surety, or covenantor. Nor do I include what are called Welsh mortgages, because there the mortgagee enters at once and takes the rents instead of interest, and is by agreement or distinct understanding to have no remedy for the principal. 1 Pow. Mortg. 374, note; Patch, Mortg. 22, 29; 3 Atk. 280. But he agrees merely to reconvey on its payment. Coop. 189; 5 Brown, Dec. 275.

It is true likewise, that it must have been a mortgage at first, or ab initio, and not by any subsequent parol agreement. 1 Pow. Mortg. 116, note; Id. 125; Price v. Perrie, Freem. Ch. 258; Copplestone v. Foxwell, Id. 150; Vernon v. Bethell, 2 Eden, 110. This case was of that character, confessedly on both sides at first, in 1824. And if once a mortgage in any way, no subsequent or collateral agreement to prevent a redemption is allowed to bar it; as once a mortgage, it is always a mortgage until a foreclosure, regular and designed as one. 2 Vern. 520; 1 Eden, 59; 7 Ves. 273; 4 Ves. 350. Most of the controverted cases in the books relate to such as where the sale may have been conditional, but not conditional as a mortgage, without raising the question, whether there was any debt. 1 P. Wms. 270; 3 P. Wms. 360; 1 Ves. Sr. 406; 2 Atk. 496; 2 Ball & B. 278. That, however, is not the point here; the sale here being clearly absolute, if it is not a mortgage. In such cases, seldom if ever, would the grantee be compelled to resort to a suit for the debt, as the very transaction usually implies that the land is worth more than the debt, else the form of an absolute sale would not be resorted to, so as to try to prevent a redemption. But if the premises actually prove to be worth less than the real debt, and all the facts indicate the deed to have been a mortgage, and so understood by the grantor as well as the grantee, I see no good reason on principle, except in the case of Welsh mortgages, why the grantor as mortgagor should not be liable to pay any balance not discharged by the value of the land. 1 Pow. Mortg. 373, note; Robinson v. Cropsey, 2 Edw. Ch. 138; 2 Ball & B. 274; Kelleran v. Brown, 4 Mass. 444.

3. The next material fact proved here, and which bears strongly on the question, whether the deed of 1827 was intended as a mortgage or not, is, that the value of the land and buildings was, on all the evidence, double if not treble the consideration or debt due from Mrs. Jones. This has before been illustrated both by the prices given for them, and the opinions of those well acquainted with them, and also the rents actually paid to Mrs. Jones, Mrs. McLean, and in some cases to Dr. Phelps. The law is very clear, for reasons before stated, that such a fact is very decisive to show the transaction must really have been meant not to be an absolute sale. 4 Blackf. 99; Lewis v. Owen, 1 Ired. Eq. 290; Morris v. Nixon, 1 How. [42 U. S.] 118; Hunter v. Marlboro, [Case No. 6,908;] Conway's Ex'rs v. Alexander, 7 Cranch, [11 U. S.] 241; Co. Litt. 204, b, note.

4. Next to this in importance is the fact of the possession retained so long by the grantor and her heir after the sale. Remaining in her one year under a lease would in some degree for that year explain and obviate the inference that it was not a sale, if the lease had been for an amount of rent looking bona fide and real; that is, $150 to $200, the rate it had usually been leased for to others. But it was for only $55 nominally, and only about $34 per year was paid for the first two or three years, and after that still less. This possession was continued likewise for fourteen years by Mrs. Jones and her mother, without any renewal in writing; and the entire control over the premises was thus long exercised by them, and no payment of over $34 a year, being about the amount of interest on the debt and little over half the nominal rent, and only one fifth of the real value of rent. During several years the payments varied but little from the true amount of interest on the original debt. The possession after this formal sale and this payment

of no higher rent than the interest on the original debt, are very decisive evidence that there had been no intention on either side to treat the matter as an outright sale by one and purchase by the other. Nor is there the least danger to the community in such a construction. For it puts the trust estate in the person occupying, and thus the apparent owner, and deceives nobody where the rights all remain in the original parties and their heirs, as here. If third persons acquire interest without notice of secret trusts, that gives rise to different considerations and new equities, especially in respect to personal estate. But as to real estate in this country, where registries exist for notice, they as to third persons are the best guide. 14 Serg. & R. 333; Leland v. The Medora, [Case No. 8,237.]

5. In connection with this is another fact just adverted to, not only that interest on the debt was the amount paid quarterly or yearly, and not so much as the rent named, or one fourth of the real value of the rent, but it was paid and receipted for in writing as "interest" and not as "rent" at all, till after Mrs. Jones's death, and then oftener under the name of "interest" than of "rent." All the evidence on this has been explained at length, and the attempt to obviate the force of it in some degree by alterations proved in such receipts as remained in the respondent's possession from the word "interest" to "rent" in some cases, and in others adding "rent," where the word did not exist before, evinces the importance attached to this written confession of the true relations which existed between the parties. These are pregnant confessions, that the actual transaction originally was considered by both parties as a mortgage. Finch, Prec. 517; 1 Madd. Ch. Pr. 517. They are in writing likewise, and thus obviate any objection as to the statute of frauds. 1 Johns. Ch. 273; 16 Mass. 621; and various cases in Hunter v. Marlboro, [Case No. 6,908.]

6. There are also various confessions of Phelps testified to, and satisfactorily substantiated by the evidence, that the transaction was meant to be a mere security for his debt.

7. Finally, his written memorandum given to Mrs. McLean in 1834 of the whole debt due to him, and which, in the ordinary meaning of the words after the other proof in this case, must be considered as including what remained due on the original consideration of the deed of 1827, indicates the whole affair to have been a mortgage. Nor could this memorandum apply to any other debt accurately, such as the arrears of rent, they being then a sum much less. But it corresponds nearly with the principal of the mortgage debt. So the payments made by Mrs. McLean seem to have been applied to the mortgage debt, and were not on any other claim as now set up, else the mortgage debt in the principal of it would not thus have been reduced about $100. Some blotting of the word "four" before "hundred" in this memorandum, supposed to be made since the paper was filed, led to some discussion and testimony, but it is not deemed by the court so important to a correct decision of the case as to enlarge on it. But that the word was in fact four and not five when filed, all the evidence combines to show, and Mrs. McLean swears it was made so originally by Dr. Phelps himself. Nor is it possible to reconcile the reduced amount paid for "rent or interest," as the principal of the debt was reduced, except that both parties understood the real rent to be paid to be graduated as interest on the original principal, and to fall as that had been in part discharged by Mrs. McLean, and not some other debt or principal for arrears.

Enough of this analysis of the particular facts proved or admitted which are competent, and which in equity entitle the plaintiffs to judgment. Before closing, it may be added, that there is one prominent reason running through the whole transaction, which requires a court of equity to look on it with jealousy, and to protect the wife of the complainant and her mother, in case of doubt, from any imposition or loss. The mother was a widow, the daughter a minor as well as fatherless, and her guardian another widow. They must be unskilled in business compared with the respondent, a man, and familiar with and attentive to it. One strong proof of this is the evidences of payments by Mrs. Jones being all left in his possession, and on his copy of the lease, instead of being, as they should have been, in her custody. He too was a money lender, and Mrs. Jones a borrower; she needy and dependent, and he possessed of considerable wealth. This property, by the evidence worth at least from $1000 to $1500, under these circumstances goes into his hands for the payment or security of only $565. Considering it as being then, on all the facts and law of the case, as security and by way of mortgage after 1827, as it confessedly was before, the decision would still yield to him all his principal and interest, and require from the complainants the full payment of every thing they owed. To do more would evidently violate the original agreement of the parties as proved and admitted, and hence violate the law; and for no purpose, but to give the respondent much more than his debt, and take from some helpless women much more than they owed. Let the deed of 1827 be treated as a mortgage, and an account be taken by a master of what was due to the respondent, deducting rents, and profits and part payments, and allowing interest, permanent repairs, and taxes paid.

[For subsequent opinion denying defendant's petition for a rehearing, see Bentley v. Phelps, Case No. 1,332.]