THIS case came up on cross appeals, the first by Stockley alone, as one of the respondents, and the other by Horsey, Millar Co., complainants in the court below, to the decree of the Chancellor sitting in and for Sussex County, and were heard together as one and the same case before Gilpin, C. J., and Wootten, Houston and Wales, Associate justices, in this court, The nature of the case, the substance of the bill and answers and the evidence in it, will sufficiently appear from the opinion delivered by his honor the Chancellor in the court below, and read in this curt, which was as follows:
This case arises under the following circumstances. William B. Horsey and John E. Martin, lately trading under the name and style of John E. Martin, at Seaford, in this state, became indebted to sundry creditors in the City of Baltimore whom they were unable to pay. In September 1866, Horsey visited Baltimore with a view to effect a settlement of the debts. A few days after, Benjamin Stockley followed him for the purpose of aiding him in effecting a settlement. The negotiations with the creditors resulted in their receiving fifty per cent. on the amount of their respective debts. The money was paid by Stockley and the bills receipted to him. The total amount of the debts thus settled was $4,060.95. The amount of money paid to the creditors was a little more than fifty per cent. on the gross amount. One of the debts which was of small amount was paid in full. The fifty per cent. was accepted by the creditors in full satisfaction of any further claim on their part, but whether the transaction was in effect a legal discharge of the debts or a purchase of them by Stockley is one of the points of controversy. *Page 605 
On the 27th of December 1866 Horsey gave his judgment bond to Stockley for $4,625.00 with interest from date, upon which judgment was entered in the Superior Court of Sussex County on the 25th of February 1867: execution was issued on said judgment under which the real estate of Horsey was sold by the Sheriff for $5,475.00, Stockley being the purchaser. He paid to the Sheriff the ten per cent., $547.50, but failed to comply at the return of the sale, and, thereupon, on the 26th of August 1871 further execution was issued under which a sale of the property was made and Stockley again became the bidder at $4,500.00. With the terms of this sale he complied and took title to the property by the Sheriff's deed. The proceeds of sale being $4,500 together with the forfeited ten per cent. on the first sale ($547.50) remain in the Sheriff's hands under the Injunction issued in this cause. They are here claimed by the complainants, so far as they are necessary to satisfy the judgment held by them against Horsey for $2,965.78 with interest from August 17th, 1867, this judgment being the first lien against Horsey's real estate after the judgment of Stockley. The bid seeks to avoid Stockley's judgment upon the ground of fraud, and charges that the bond upon which the judgment was entered was given by Horsey to Stockley without any consideration and in order to defraud Horsey's creditors; that the money paid by Stockley to the Baltimore creditors was in fact furnished by Horsey, that even the money paid by Stockley to the sheriff for the real estate was furnished by Horsey, that the whole proceeding was a fraudulent scheme by which the property should be secured to the use and benefit of Horsey clear of his debts. The bill prays that so much of the fund in the Sheriff's hands as may be necessary shall be applied to the judgment of the complainants. It also prays that Stockley may be decreed to convey to Horsey the real estate purchased at Sheriff's sale.
The answer denies in toto the fraud charged by the bill. It alleges that the money paid to the Baltimore creditors *Page 606 
was raised out of Stockley's own means and no part of it derived from Horsey. It claims that the purpose or effect of Stockley's settlement with the creditors was to make him a purchaser of the debts and to entitle him to collect the whole amount from Horsey and from Martin, and that the bond for $4,624.00 was given by Horsey in good faith to secure the just demand of Stockley, the co-partner, John E. Martin, having declined to join in it. With respect to the money paid by Stockley to the Sheriff for the real estate, the answer alleges that it was raised by the sale of certain government securities borrowed by Stockley from William H. Hazzard in Brooklyn, N. Y., for which he has since accounted and that no part of the purchase money was derived from Horsey. At the hearing of the cause the prayer for a conveyance of the real estate to Stockley by Horsey and the charges upon which it was founded were abandoned, and the controversy was confined to the validity of the bond and the judgment under which the real estate was sold. The defendant, Stockley, clains under the bond in controversy the right to receive the whole amount of the Baltimore debts ($4,060.95), although in point of fact he confessedly paid in the settlement of those debts only the sum of 82,107.28, upon the ground that the settlement was a purchase and not a discharge of the debts; on the other hand the complainants insist that although Stockley did pay the fifty percent. a fact so clearly proved as not to be disputed in the argument, yet that he is entitled under the bond to receive no thing, not even the reimbursement of the sums paid by him.
My own conclusion is between the conflicting claims of the parties. I think Stockley is entitled to be reimbursed what he paid with interest, and nothing more on account of the Baltimore debts. I will state my reasons. In the first place it is clearly proved and now hardly if at all disputed, chat Stockley applied to the debts his own money and that no part of it came from Horsey. The answers of the defendants on this point being responsive to the bill would be alone conclusive, but they are corroborated by *Page 607 
the testimony of Edmundson. It appears from the testimony of this witness that Horsey failed in his first plan of liquidating these debts by raising a loan upon the mortgage of his real estate, and that at this juncture Edmundson advised Stockley to take Horsey's affairs in hand, and upon Stockley's objecting that he had not the money at command, offered to loan him what might be necessary to settle with the other creditors, and to take Stockley's note for the fifty per cent. on his own debt. Stockley acceded to this suggestion and it was carried into effect. Edmund-son's debt amounted at that date to $2140.77, one half of which was $1070.38. Stockley paid in cash $70.38 and gave his note for $1000.00 which Edmundson further testifies Stockley afterward paid, partly out of the proceeds of grain and partly in money at different times. Edmundson also loaned to Stockley $1000.00 for the purpose of enabling him to settle with the other creditors, a sum very nearly sufficient for that purpose, and this loan was afterward repaid by Stockley.
In the next place the evidence clearly satisfies me that the transaction between Stockley and the creditors was not a purchase of their claims, but a satisfaction and discharge of them for Horsey 
Martin's benefit, the payment by Stockley being in effect a loan to Horsey and Martin. The settlement with the creditors was the direct fruit of a negotiation just had between Horsey and the creditors at a meeting with them for the purpose of obtaining a compromise of the debts at fifty per cent. Stockley was not present at the meeting, but was, throughout, in communication with Horsey, acting as his friend and adviser in the business; and his settlement with the creditors, as appears by his answer and Edmundson's testimony, was made upon a suggestion of Edmundson, which evidently looked to a compromise for the benefit of the debtors. I must consider that such was the substance and effect of the transaction, and in accordance with this view of it the vouchers given by the creditors to Stockley and produced in evidence are all receipts in full of the respective claims, and not *Page 608 
assignments or agreements to hold them for Stockley's use. There is nothing whatever in the circumstances or in the form of the receipts to suggest the idea of a purchase. I come, now to the real point of controversy, which arises out of the denial on the part of the complainants of the right of Stockley to receive under the judgment, even the sums paid by him for Horsey Martin. The complainants insist that the bond was void in toto on two grounds. 1st, That it was an illegal preference of one creditor over others, contrary to our statute against fraudulent insolvency, Rev. Code pp. 486, 487, — the bond being given as is insisted in contemplation of insolvency, and of sufficient amount to cover — all the debtor's property; but under the provision of the statute referred to,sec. 4, chap. 132, it is not preferences given in contemplation of insolvency, or under failing circumstances which are prohibited, but preferences given under an assignment made for the benefit of creditors; it is the act of assignment and not merely his being in failing circumstances which brings the debtor within the scope of this statute. Our law recognizes two distinct policies with respect to the liquidation of a failing debtor's estate, and one is the policy of giving to a creditor the benefit of his diligence as against other creditors. This policy obtains so long as the debtor keeps the control of his property by not making an assignment. If no assignment be made he may prefer an honest creditor, though he be in failing circumstances, and though the preference in effect covers all his property for the benefit of creditors; but the moment he makes an assignment, and not before, the policy of equal distribution among all the creditors prevails, and the debtor can give no preference either under the assignment, or by an act done in contemplation of it. There is sound reason for treating the fact of an assignment as a test of the application of this statute to the debtor. It is a highly penal statute, and, upon general principles, penal statutes are to be strictly construed, and especially should that rule apply to this statute, for if the fact of an assignment alone subjects the debtor to its provisions, *Page 609 
and renders him punishable for a preference, we have a certain test of his liability which he himself could not misunderstand, and which could be easily proved against him, but if his being in failing circumstances is held to render the preference of a creditor illegal, and subjects the debtor to the penalty of the law, a very uncertain test of his liability would be created, depending upon a wide range of proof; and frequent injustice might be done to debtors who as often fail to appreciate their real situation and honestly believe themselves to be solvent when they are not solvent. On the whole it is a sound policy of the statute working the least injustice, which avoids a preference only when given under or in contemplation of an assignment. The point now made under this statute was first raised in Newell vs. Morgan, 2 Harr. 225. A creditor who had obtained, by confession, a judgment against a failing debtor, pending suits against him by other creditors, filed a bill in equity in order to reach certain real estate which the debtor had previously bought and paid for, taking the title in the name of his children. The Chancellor decreed the conveyance to be fraudulent as against creditors and directed the real estate to be sold and the proceeds to be brought into Court. At this stage of the cause the other creditors who had obtained judgments after the complainant, came in and by petition were admitted as parties. In the proceedings which followed, the other creditors contested the validity of the complainant's judgment as a fraudulent and illegal preference within the statute under consideration; the point was raised and argued; the Court do not appear to have considered it of sufficient substance to be discussed in the opinion delivered, but treated the complainant's judgment as unquestionably valid and enforced it against the proceeds, giving it its legal priority as the first of the judgments recovered.
This case is a very strong one to show how far under our law, the policy of diligence prevails where no assignment is made. For in this case the complainant's judgment had no legal priority against the lands, the legal title *Page 610 
to which was never in the debtor: the land was sold as the estate of his children and the proceeds brought into Court and subjected to the debts of the real purchaser upon the ground of fraud. Now the doctrine of equity is, that distribution in that Court among creditors shall bepari passu, and the Chancellor in the case cited held the doctrine applicable and allowed no legal priority among the creditors. But the Court on appeal held that the principle of diligence should prevail and that the proceeds of the land should be distributed, not as equitable assets, but according to the legal priority which the judgments would have held against the land itself. The next case upon this statute is Waters vs. Comly, 3 Harr. 117. Here there was z, clear attempt to evade the statute. A debtor to a very large amount gave to a creditor in the sum of only $400.00 his judgment for over $18,000.00, under which goods were cold for over $16,000.00. The judgment was given to secure the $400.00 due to chat creditor and the balance to be in trust for other creditors according to a schedule. The scheduled creditors held debts sufficient to exhaust the proceeds of the debtor's goods; the judgment was given without communication with them or even their knowledge and without any diligence on their part which is the principle of the law in allowing preferences. The judgment effected, and was so intended, precisely what would have been the result of a formal assignment for the benefit of creditors giving preferences. The Chancellor in the case when before him, and the Chief Justice on appeal, expressed the opinion that the judgment, considering its manifest object and operation, was against the policy of the statute; they do not appear to have considered it as actually within the provision of the statute so as to avoid the judgment altogether, and so as to have subjected the debtor to the penalty for a fraudulent assignment, for they held the judgment valid for the debt of the creditor for whom it was given, and only held it void as to the scheduled creditors, the preference of them being an intended fraud upon the policy of the statute, although the case itself *Page 611 
was not within the provisions of the statute. This is the only construction chat can be given to the opinions of the Chancellor and the Chief Justice. They would not at all apply to a case like the present in which the judgment was given to one creditor for his own sole benefit, and not in trust for a class of creditors. I should observe, however, that in Waters vs. Comly, Justice Harrington did not go so far as the Chief Justice. He held the judgment to be wholly unaffected by the statute against fraudulent assignments, as not being within its provisions, nor avoided because in conflict with its policy. In the case of Waters vs. Comly the judgment as to the scheduled creditors was held void by the whole Court upon another and distinct ground, that is, that the trust was revocable and of no legal force. That was the only point judicially decided upon the other question relative to the statute against fraudulent assignments. We have only the differing views of the two Judges who delivered opinions in the Court of Appeals. It is perfectly immaterial to this case which of the two may be considered as correct.
We come now to the case of Tunnell vs. Jefferson, 5 Harr. 206. There the debtor assigned to trustees, certain real and personal estate, being all his property, in trust to indemnify his securities in certain guardian bonds with a provision reserving to himself any remaining balance. The trustees, it appears, did not proceed under the assignment, but reconveyed the real estate to the debtor and afterward proceeded under a judgment for $15,000.00, which the debtor at the time of making the assignment had executed to the same trustees, and upon the like trusts. A bill was filed to set aside both the assignment and the judgment with the proceedings under the judgment, on the ground that being in contemplation of insolvency, they created an illegal preference in fraud of other creditors. The Court of Appeals upon quite a full examination of our statute against fraudulent insolvency, held that it prohibited preferences only when made under or in connection with an assignment for *Page 612 
the benefit of creditors. The assignment which was drawn into question in that case, the Court considered not to be an assignment for the benefit of creditors within that statute and consequently held the preference even, to be not illegal. That is the substance of the decision. There was certainly far greater reason to held the transaction there inquired of to be within the policy of the statute, than the one we are now considering. I can see in the giving of this judgment by Horsey to Stockley, so far as it covered the debt actually due, no thins; more than the ordinary case of one creditor obtaining by his superior diligence a prior security for his own debt, a security given for his own benefit alone and not in trust for any class of creditors, as in Waters vs. Comly, and not appearing as in that case to have been given with the very purpose of effecting an actual distribution of the debtor's estate among creditors in a manner prohibited by the statute. Stockley's judgment affected the property of the debtor only to the amount of the debt due to him, for so the decree in the cause will restrict its operation. The fact that the debtor was in failing circumstances, and that the debt thus secured, might in the result exhaust his property, are not sufficient grounds to deprive the creditor of the benefit of his diligence. I conclude, therefore, that Stockley's judgment is not void under the statute against fraudulent preferences in assignments for the benefit of creditors.
The other ground upon which it was argued that Stockley's judgment is void in toto, is that the bond was given for the excess over the money actually paid by Stockley with the intent to defraud creditors.
We have on this subject a plain rule to guide us. It is this: actual or express fraud avoids a conveyance or security absolutely and for all purposes, as well inequity as at law. A party to a transaction founded in actual fraud, can derive no right from it. The law simply treats the transaction whether a conveyance or security, as if it had never been made. Sands vs. Codwise, 4 Johns. *Page 613 
536, 599. Harris vs. Sumner, 2 Pick. 129, 136. But where on the other hand a conveyance or security is only constructively fraudulent in some part, as for being voluntary when there are existing debts, or for being contrary to some public policy or from any inequitable circumstances, it may in equity be avoided in part, and enforced as to the residue. In this, Equity differs from the law, which can hold no middle course, but must either avoid or uphold the instrument altogether. Instances of this mode of dealing by Courts of Equity with conveyances or securities partially affected by constructive fraud, ore not un-frequent, as where a conveyance has been obtained under inequitable circumstances, but money has been paid under it by the grantee, the Court will hold it good as security for the money paid. Boyd vs. Dunlap, 1 Johns. Ch. Rep. 479; McMeekinvs. Edwards wife, 11 Miss. Ch. Rep. 288, are cases of this kind. So if a conveyance is voluntary and therefore constructively fraudulent as against existing creditors, it is nevertheless in the absence of actual fraud good against subsequent creditors. This distinction between the effect of actual and constructive fraud, is clearly presented and illustrated by Chancellor Kent in Boyd vs.Dunlap, and in the note to Salmon vs. Bennett, 1 Amer.Lead. Ca., 73, where other cases on the point are cited. Now, as to what constitutes actual fraud and also what should be the measures of proof to establish it, the best statement of the law I have found is by Justice Baldwin, in his charge to a jury in Magreeac vs.Thompson. Baldwin's C. C. Rep. 356. He defines it, as affecting creditors, to consist in an intention to injure, defraud, delay or prevent them from recovering their just debts by any contract, gift, deed, settlement or agreement, withdrawing, or attempting to withdraw, the property of a debtor from the reach of his creditors. The point is, that motive or intention is an essential ingredient in actual or express fraud. Perhaps it would be best defined by calling it meditated or intentional fraud. With respect to the proof of it, Justice Baldwin further says: *Page 614 
"Proof of fraud need not be express, it may be inferred from circumstances, but ought not to be presumed without either. A jury ought to be satisfied from facts that there was a dishonest intention and not to infer fraud merely because they have doubts of the fairness of the transaction. From the conduct and situation of the parties and the effects intended to be produced by the act, something should be made to appear inconsistent with integrity so as to admit of no reasonable interpretation but meditated fraud." 4 Peters,
295, 297. Further, he says: "Both parties to the alleged act of fraud must concur in the illegal design. The debtor may lawfully sell his property or prefer one creditor to another with the direct intention of defrauding other creditors, but unless the purchaser or preferred creditor receives the property with the same fraudulent design, the contract is valid (8 Wheat. 238, c.) against other creditors or purchasers who may be injured by the transaction." Again, Justice Baldwin adds, "The admissions or declarations of the debtor as to the object intended to be effected, are evidence to contradict his answer to a bill brought to annul the act as fraudulent, out not to affect the parties claiming under it, or to have a bearing on the whole case." These principles although announced in a case at law, apply in equity as well. For although it has been said that Courts of Equity will act, upon slighter presumptions of fraud than ought to satisfy a jury in a court of law, any such distinction is without foundation in principle. It is the subject of a very just criticism in 1 Sto. Eq., Sec. 190.
The result is that in order to affect Stockley's judgment with such actual or express fraud with respect to the excess, as will avoid the judgment in toto, the conscience of the Court should be satisfied from facts, admitting of no other reasonable interpretation, that the bond was given for the full amount of the Baltimore debts with a dishonest intention on the part of both parties to it, to delay or prevent Horsey's other creditors in the recovery of their just debts. Now on this the decisive question I must declare *Page 615 
myself not satisfied from all the facts of the case that such was the real purpose for which the bond was given and accepted.
In the first place both defendants answering responsively on this point positively deny such or any other purpose in fraud of creditors. The usual effect as evidence given to a responsive answer and the necessity of rebutting it by the testimony of two witnesses or of one with corroborating circumstances, or by proof of at least very strong circumstances in conflict with the answer, would seem to apply with its greatest force where the inquiry concerns the motive or intention of a transaction, for what was the motive or intention of a party lies exclusively within his own breast, and all that can be known of it independently of, or contrary to his answer, is by inference only from his acts or conduct. Now any inference of an illegal or fraudulent intent which is to overcome the defendant's sworn answer in response to the bill, ought to be drawn only from facts and circumstances in the situation and conduct of the defendants which as Justice Baldwin puts it, admit of no reasonable interpretation but meditated fraud. Let us turn then with this test to consider the evidence. But first we should notice the precise form of fraud which is relied on in the argument for the complainants. The argument here departs from the Bill. The case made by the Bill was that Horsey paid all the money applied to the debts and Stockley none of it and that the bond was therefore a voluntary one, such as is void against creditors absolutely irrespective of motive. But under the proof this ground was abandoned, the complainant's counsel not denying that Stockley furnished the funds used. This fact gave to the bond, to that extent, a sufficient legal consideration so that it could not be avoided except for actual or express fraud, and the fraud relied on was that the excess over and above the money paid by Stockley was added, so that the bond might be used as a means of coercing creditors by throwing them so far behind, as to induce them either to abandon the collection of their debts or to compromise *Page 616 
them. To this point as well as to the question of fraud generally in any form I have weighed the evidence. On the whole the general bearing of it seems to me rather to support than to rebut the broad denial by the answers of an intent by this bond to defraud Horsey's other creditors. For one thing, the conduct of these defendants lacks some of the usual badges of fraud such as would have been likely to mark a concerted scheme to make use of the excess of Baltimore debts as a cover against Horsey's other debts. There would most probably have been a more formal assignment of them, so as to give Stockley an unquestionable control of them to their full amount. Fraud almost invariably veils itself under exactness in legal forms. Then the subsequent conduct and declarations of these parties lack the circumspection which a fraudulent purpose can hardly fail to inspire. Had Stockley meditated the use of this judgment to its full amount as a cover against Horsey's debts, he would have been more reticent in expressing to Anderson and Nathaniel Horsey any disposition or purpose to accept in satisfaction the amount actually paid by him.
Again, with such a concerted purpose in the compromising of the Baltimore debts, Stockley would hardly have, on his return home, offered to Martin the other partner, to accept them in full, as indemnity for the money paid and trouble incurred. Nor, if a fraudulent use of the bond for Horsey's benefit were meditated, would he, with all his disposition to allay his uncle Natty Horsey's anxiety, have been so quick to assure him that he really owed Stockley only some $1000, or $1100. Then again, some of Horsey's declarations which are adduced in evidence, show rather a case of extortion on the part of Stockley, submitted to by Horsey, than of collusion between them. Such is the clear effect of Horsey's explanation to his uncle Natty Horsey of his reason for giving the bond, "that Stockley had so harassed him and teased him that he had to give him his judgment note for over $4000, in order to get rid of him." Altogether the most natural construction of all *Page 617 
the circumstances is, that Stockley considered himself (rightly or wrongly, it matters not to this point) entitled to stand in the place of the creditors whose debts he had settled; upon this right he relied in his conversation with Nathaniel Horsey, saying that if the compromise had been made for five cents on the dollar, he had the right to take William H. Horsey's note for the whole amount of the claims. Horsey, who of the two, was evidently a man of much the less force of will, gave the bond as a concession to this demand on the part of Stockley. It is no, unlikely, indeed, it is quite in keeping with Stockley's talk to Natty Horsey and Anderson, that Horsey may have had some reason for an expectation that if be could pay the amount actually advanced by Stockley the excess would not be exacted. As much is indicated by the confidence he expressed in the conversation with Edward L. Martin and Geo. Horsey, of Stockley's willingness to remit the excess, if he could pay the moiety of this judgment. Indeed, Stockley's offer to Martin soon after his return from Baltimore indicated some disposition then to accept a full indemnity, if one were then made to him. Why he afterward took from Horsey a bond for the whole amount, I am not able with absolute certainty to determine. It is wholly a matter of conjecture; but the hypothesis which best harmonizes with all the circumstances is, that no settlement having been made with him as proposed to Martin, Stockley chose to stand on his legal right, according to what was evidently his notion of it, and demanded a bond for the whole amount from Horsey. The latter with some weakness, yielded, probably with an expectation that the whole might not be exacted. Yet, as is the usual course, Stockley having got the advantage, continued to hold it, until Horsey, disappointed, became angry, and then, all naturally enough, come his complaints to Nathl. Horsey in the spring of 1871. It is certainly a noticeable face in connection with the hypothesis that this bond was given as a scheme for coercing creditors either to abandon the collection of their debts, or to abate the amount of them by compromise. It *Page 618 
is a noticeable fact, I say, that there is no evidence of a single effort made so to use it; such as we should expect if it was taken to be held in terror em, and this, notwithstanding that after it was given, all the creditors proceeded without any regard to it to recover judgments. The negotiation between William B. Horsey and Geo. Horsey, and the conversation between Stockley and Anderson, are not exceptions to this remark. The conversation between Edward L. Martin, Geo. Horsey and William B. Horsey, was sought in the first place by the former, not the latter. It does not appear that Stockley's judgment had any influence in prompting Geo. Horsey to seek an amicable arrangement; but however that may be, it is certain that William B. Horsey did not in the conversation hold it interrorem over those creditors, though the most difficult to deal with, in order to coerce an abatement; on the contrary, the proposal he made contemplated nothing less than the settlement of the whole of their debts, one-half by his co-partner Martin, and one-half by himself, according to their just share of it as between themselves. Nor does he present Stockley's judgment as at all an obstacle, but freely expresses his expectation of Stockley's remitting one-half of that judgment, and professes his ability easily to raise by mortgage the moiety of Horsey, Millar Co.'s debt which he was ready to assume. Nor does he put Stockley's release of one-half of the judgment only upon the condition of Horsey, Millar Co.'s compromising with him for one-half of their debt, as we should expect, were that judgment held as the means of coercing a compromise. He does not say, as the witness states it, if he could get clear of Horsey, Millar 
Co.'s judgment, he could then get Stockley to accept one-half of his judgment, He speaks of it as certain (whether he had reason to think so, does not appear) that he can satisfy Stockley by paying one-half. It was his clearing the docket altogether that depended on the arrangement with Horsey, Millar Co. His language as reported by the witness was, "that if John E. Martin would agree to pay one-halfc., he *Page 619 
could easily pay the remaining half of said judgment by mortgaging his property; for if he could get clear of one-half the Horsey, Millar 
Co.'s judgment, he could raise money enough by mortgage on his property to clear the docket, as he could satisfy and discharge the judgment for $4625.00 which Stockley had against him, by paying the one-half of it." This is not the tone in which that judgment would have been spoken of if used to coerce a compromise. Rather, it would have been held up as one to be enforced to the last dollar, so abridging Horsey's means of payment that other creditors would do wisely to accept what they could get. At all events, it fails to demonstrate that its purpose was fraudulently to hinder and coerce the creditors.
Then we come to the conversation with Mr. Anderson. The direct object of this interview on the part of Stockley had no reference to the Bank judgment. The purpose of his visit to Anderson as President of the Bank, was not to negotiate for Horsey for a compromise of the Bank debt, but to obtain a loan of $5000. In the course of the conversation he referred to his own judgment against Horsey, and expressed the same ideas about it which he had to others, i.e.,
that he had a right to hold it all, but, that if Horsey should be able to settle, he had a right, not that he would, but that he had a right to abate one-half. I cannot, under all the circumstances, ascribe to what is here said any greater force than as a casual suggestion thrown out with a somewhat vague idea of its somehow or other making some weight to induce a disposition on the President to favor the loan, under the idea that a better settlement with the Bank might finally be reached, if Horsey were enabled to raise some money; that he himself in that case might, not that he said he would, but might, abate on his claim. No allusion was made to the judgment; no offer of compromise was made on behalf of Horsey, such as we should expect, were the object of this conversation to influence the action of the Bank under this judgment and not merely to effect the loan. *Page 620 
On the whole, I come to this conclusion. What was the precise purpose of taking this bond for the whole amount of the Baltimore debts, I may not be able with absolute certainty to decide. It is not necessary I should. The material question is, whether a fraudulent purpose is so clearly demonstrated by facts, to take Justice Baldwin's test, "admitting of no other reasonable interpretation," as to overcome, first, the general presumption against fraud, and 2d, the responsive answer of the bill, and also so clearly as to fully satisfy the conscience of the Court in making a decree of such serious consequence as to make Stockley forfeit the advances unquestionably made by him. I am certain that the evidence relied on for fraud, does not rise to the grade of proof; — at most, it is but a case of suspicior, and all authorities agree, that a charge of fraud, though it may be made out, and usually is, by circumstantial evidence, must yet be proved. The circumstances must be in a good degree demonstrative and not suspicious only. In a case of merely suspicious circumstances, if money had been actually paid under the instrument impeached, it has been held by so great an authority as Chancellor Kent in Boyd vs. Dunlap. 1 Johns. Ch. R. 479, that it is safer to avoid the instrument so far as it is without consideration, or inequitable, but to hold it good for the money advanced under it. That case has already been cited to the point that actual and not constructive fraud only is essential to avoid a deed or security in toto; but this decision goes further and holds that even under circumstances raising suspicion of actual fraud, but not amounting to proof, it is the approved and safer rule in equity, to allow the re-imbursement of a consideration actually paid under the impeached instrument, and to that extent to hold it good, while avoiding it as to the residue. The Chancellor in his opinion shows by authorities the uniform practice of the Court, that while "a deed fraudulent in fact is absolutely void, and is not permitted to stand as a security for any purpose of re-imbursement or indemnity, it is otherwise with a deed obtained *Page 621 
under suspicious or inequitable circumstances, or which is only constructively fraudulent." And after citing some corresponding decisions on the point by Lord Eldon and Lord Hardwicke, Chancellor Kent concludes, that "nothing can be more equitable than this mode of dealing with these conveyances of such indecisive and dubious aspect that they cannot either be entirely suppressed or entirely supported, with satisfaction and safety." In the case before him, a father indebted had conveyed to his sons, property both real and personal. The real estate was afterward levied on and sold under judgments against him, and bought in by creditors who filed the bill to set aside the conveyance as a fraud on creditors;. The sons had paid a consideration for the conveyance to them, but what the Court speak of, as one considerably inadequate. Yet the Chancellor says he cannot discern in the evidence "such traces of actual and direct fraud" as to warrant him in holding the conveyance absolutely null and void; nor yet could he altogether sustain it. He therefore took the middle course above stated, as the safest and most satisfactory. The case now before the Court is within the same reason. With respect to those items entering into the consideration of Stockley's bond in addition to the Baltimore debts, I take the answers, responsive as they are to the bill on the whole subject of consideration, to be conclusive; for as to these items there is no contradictory evidence whatever.
The result on the whole case will be a decree allowing Stockley to receive the fifty per centum paid by him to the Baltimore creditors with its interest, and also the other items of consideration set forth in the answers with interest; but restraining any further payment to him by the Sheriff. What remains of the funds in the Sheriff's hands will be applicable to the judgment of Horsey, Millar Co. The costs to be paid by the respondent, Stockley.
This Court affirmed the decree.